# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

MARSHA CASPAR, GLENNA
DEJONG, CLINT McCORMACK,
BRYAN REAMER, FRANK
COLASONTI, JR., JAMES BARCLAY          Case No.
RYDER, SAMANTHA WOLF,
MARTHA RUTLEDGE, JAMES                 Hon.
ANTEAU, JARED HADDOCK,
KELLY CALLISON, ANNE
CALLISON, BIANCA RACINE,
CARRIE MILLER, MARTIN
CONTRERAS, and KEITH ORR,

       Plaintiffs,

vs.

RICK SNYDER, in his official capacity
as Governor of the State of Michigan,
MAURA CORRIGAN, in her official
capacity as Director of the Michigan
Department of Human Services,
PHIL STODDARD, in his official
capacity as Director of the Michigan
Office of Retirement Services, and
JAMES HAVEMAN, in his official
capacity as Director of the Michigan
Department of Community Health,

       Defendants.

_____/

## COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

## INTRODUCTORY STATEMENT

1.      Plaintiffs Marsha Caspar and Glenna DeJong, Clint McCormack and Bryan Reamer, Frank Colasonti, Jr. and James Barclay Ryder, Samantha Wolf and Martha Rutledge, James Anteau and Jared Haddock, Kelly Callison and Anne Callison, Bianca Racine and Carrie Miller, and Martin Contreras and Keith Orr are eight same-sex couples who were legally married in Michigan on March 22, 2014, but are now being denied, along with their families, the dignity, recognition, privileges, and benefits that all legally married couples and their families deserve and are entitled to under the law.

2.      Plaintiffs were married in Michigan after this Court, in *DeBoer v. Snyder*, permanently enjoined state officials from enforcing Michigan's constitutional and statutory bans on marriage for same-sex couples, and before the U.S. Court of Appeals for the Sixth Circuit stayed this Court's judgment in *DeBoer* pending appeal.  When Plaintiffs became married on March 22, 2014 in accordance with Michigan law, they immediately obtained vested rights in the validity and recognition of their marriages under Michigan law.  Their marriages, and the protections and responsibilities that flow to them and their families from their married status, are protected by the Fourteenth Amendment to the United States Constitution and must be recognized by state officials regardless of the ultimate outcome of the *DeBoer* litigation.

2

3.     In violation of constitutional protections due to all legally married couples and their families, the Governor of Michigan has publicly announced that, as a result of the Sixth Circuit's stay of this Court's judgment in *DeBoer*, the legal benefits and rights associated with Plaintiffs' marriages are being "suspended," and the State of Michigan will not recognize the validity of Plaintiffs' marriages because they are same-sex couples.

4.     By retroactively stripping Plaintiffs' marriages of legal recognition, the Governor has placed Plaintiffs and their families in an intolerable state of legal limbo that threatens their wellbeing, health, financial security, and family integrity, and denies their dignity as free and equal citizens.  Absent relief from this Court, Plaintiffs will be unable to access critical protections and benefits for themselves and their families that are enjoyed as of right by all other couples who were legally married in Michigan.

5.     By this action, Plaintiffs seek declaratory and injunctive relief requiring that their legally valid marriages be given immediate and ongoing recognition by the State of Michigan as required by the due process and equal protection guarantees of the United States Constitution.

## JURISDICTION AND VENUE

6.     Jurisdiction is proper under 28 U.S.C. § 1331 because this is a civil action arising under the Constitution and laws of the United States, namely 42

U.S.C. § 1983 and the due process and equal protection guarantees of the Fourteenth Amendment to the United States Constitution.

7.     Jurisdiction is also proper under 28 U.S.C. § 1343 because this is a civil action to redress the deprivation under color of state law of equal rights and civil rights secured and protected by the Constitution and laws of the United States, namely 42 U.S.C. § 1983 and the due process and equal protection guarantees of the Fourteenth Amendment to the United States Constitution.

8.     Venue is proper under 28 U.S.C. § 1391(b)(1) because this is a judicial district in which a defendant resides and all defendants are residents of the State of Michigan.

9.     Venue is also proper under 28 U.S.C. § 1391(b)(2) because this is a judicial district in which a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred, are occurring, or will occur.

## PARTIES

10.     Plaintiffs Marsha Caspar and Glenna DeJong are adult female residents of Ingham County.  They were married to one another in Ingham County on March 22, 2014.

11.     Plaintiffs Clint McCormack and Bryan Reamer are adult male residents of Oakland County.  They were married to one another in Oakland County on March 22, 2014.

12.     Plaintiffs Frank Colasonti, Jr. and James Barclay Ryder are adult male residents of Oakland County.  They were married to one another in Oakland County on March 22, 2014.

13.     Plaintiffs Samantha Wolf and Martha Rutledge are adult female residents of Ingham County.  They were married to one another in Ingham County on March 22, 2014.

14.     Plaintiffs James Anteau and Jared Haddock are adult male residents of Oakland County.  They were married to one another in Oakland County on March 22, 2014.

15.     Plaintiffs Kelly Callison and Anne Callison are adult female residents of Washtenaw County.  They were married to one another in Washtenaw County on March 22, 2014.

16.     Plaintiffs Bianca Racine and Carrie Miller are adult female residents of Oakland County.  They were married to one another in Oakland County on March 22, 2014.

17.     Plaintiffs Martin Contreras and Keith Orr are adult male residents of Washtenaw County.  They were married to one another in Washtenaw County on March 22, 2014.

18.     Defendant Rick Snyder is Governor of the State of Michigan.  He is being sued in his official capacity by all Plaintiffs.

5

19.     Defendant Maura Corrigan is Director of the Michigan Department of Human Services.  She is being sued in her official capacity by Plaintiffs Clint McCormack and Bryan Reamer.

20.     Defendant Phil Stoddard is Director of the Michigan Office of Retirement Services.  He is being sued in his official capacity by Plaintiffs Frank Colasonti, Jr. and James Barclay Ryder.

21.     Defendant James Haveman is Director of the Michigan Department of Community Health.  He is being sued in his official capacity by Plaintiffs Samantha Wolf and Martha Rutledge.

## BACKGROUND AND FACTS

**Michigan's Ban on Marriage for Same-Sex Couples**

22.     Prior to March 21, 2014, same-sex couples were not permitted to marry in Michigan.

23.     Michigan prohibited same-sex couples from marrying by the so-called "Marriage Amendment" to the state constitution, Mich. Const. art. I § 25, which provides:

> To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose.

24.     Several implementing or associated statutes mirror the state's constitutional ban on marriage for same-sex couples.  M.C.L. § 551.1 states:

> Marriage is inherently a unique relationship between a man and a woman.  As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting that unique relationship in order to promote, among other goals, the stability and welfare of society and its children.  A marriage contracted between individuals of the same sex is invalid in this state.

25.     Similarly, MCL § 551.3 provides, in part, that a man shall not marry another man, and MCL § 551.4 provides, in part, that a woman shall not marry another woman.

**Michigan's Ban on Marriage for Same-Sex Couples Is Enjoined**

26.     In October 2012, April DeBoer and Jayne Rowse, individually and on behalf of their children, filed an amended complaint in *DeBoer v. Snyder*, Case No. 12-cv-10285-BAF (E.D. Mich.), challenging as unconstitutional Michigan's ban on marriage for same-sex couples.

27.     On March 21, 2014, following a bench trial in the *DeBoer* case, this Court declared the Michigan Marriage Amendment and its implementing statutes unconstitutional and permanently enjoined state officials from enforcing them.

28.     This Court did not stay its judgment in *DeBoer*.

**Approximately 300 Same-Sex Couples Are Legally Married in Michigan**

29.    The following day, county clerks in four Michigan counties (Ingham, Muskegon, Oakland, and Washtenaw) opened their offices and began issuing marriage licenses and certificates to same-sex couples.

30.    Approximately 300 same-sex couples, including Plaintiffs, were married on March 22, 2014.

**The Injunction Is Stayed Pending Appeal**

31.    Late in the afternoon of March 22, 2014, the U.S. Court of Appeals for the Sixth Circuit entered an order temporarily staying this Court's judgment in *DeBoer* until March 26, 2014.

32.    The Sixth Circuit's stay order was entered after Plaintiffs and approximately 300 other same-sex couples got married.

33.    Once the Sixth Circuit's stay order was entered, county clerks in Michigan stopped issuing marriage licenses to same-sex couples.

34.    On March 25, 2014, the Sixth Circuit extended its stay of the *DeBoer* judgment pending final disposition of the state's appeal.

35.    Neither of the Sixth Circuit's stay orders addressed the legal status of the marriages that same-sex couples entered into in Michigan on March 22, 2014.

**Governor Snyder Withdraws State Recognition of the Marriages**

36.    On March 26, 2014 Governor Snyder's office issued the following

written statement:

> After comprehensive legal review of state law and all
> recent court rulings, we have concluded that same-sex
> couples were legally married at county clerk offices in
> the time period between U.S. District Judge Friedman's
> ruling and the 6th U.S. Circuit Court of Appeals
> temporary stay of that ruling.
>
> In accordance with the law, the U.S. Circuit Court's stay
> has the effect of suspending the benefits of marriage until
> further court rulings are issued on this matter.  The
> couples with certificates of marriage from Michigan
> courthouses last Saturday were legally married and the
> marriage was valid when entered into.  Because the stay
> brings Michigan law on this issue back into effect, the
> rights tied to these marriages are suspended until the stay
> is lifted or Judge Friedman's decision is upheld on
> appeal.

37.    On March 26, 2014, Governor Snyder also appeared personally at a

press conference.  He made the following statement:

> Good afternoon. I thought it appropriate to spend a
> minute or two making some comments with respect to
> the same-sex marriage case because obviously there's
> been lots of questions.  Let me set the stage
> appropriately.  You go back to 2004 is when Michigan
> passed a constitutional amendment saying that marriage
> was between a man and a woman.  It was implemented
> through statute also and it basically said that same-sex
> marriages would not be recognized in Michigan.
>
> Last Friday, that changed.  A federal judge, Judge
> Friedman, issued an opinion saying that the Michigan

Constitution was going to be struck down given the federal Constitution.  The next thing that happened then on-- was on Saturday, that there were a number of marriages across the state of Michigan, through a number of county clerks, and there was approximately 300 couples, and that took place.  The next thing that happened on that Saturday night, the Court of Appeals issued a stay, and said that the judge's opinion would be stayed until there was further judicial action.

Now this has created a lot of confusion and concern on a number of people.  In particular, you have a lot of issues with the 300 couples that went through the process of going to the county clerks and going through the marriage.  I wanted to bring some clarity because we've, again, really taken the position, we want to make sure we're in compliance with the appropriate laws.  So we've done quite a bit of legal research on this issue and what I'd say on this matter is, first of all -- and I would ask that you let me complete the entire statement because there are two elements to this -- is first of all, in respect to the marriages themselves, the 300 marriages on that Saturday, we believe those are legal marriages and valid marriages. The opinion had come down.  There had not been a stay in place.  So with respect to the marriage events on that day, those were done in a legal process and were legally done.

The stay being issued that next night really makes it more complicated and that's why I asked you to bear with me-- is, although the marriages were legal, what the stay does is reinstate Michigan law, and under Michigan law, it says the State of Michigan will not recognize the fact that they're married because they're of the same sex.  So what we have is a situation here where the legal marriages took place on Saturday but, because of the stay that the operation of law is such that we won't recognize the benefits of that marriage until there's a removal of the stay or there's an upholding of the judge's opinion by the Court of Appeals or a higher court.

> I just want to bring some clarity because, again, this is a difficult situation where people have lots of concerns and issues. And again, that's why I ask your forbearance to make sure we set the stage right and go through both steps of this process.

38.    As a result of Governor Snyder's decision, the marriages of approximately 300 couples who got married on March 22, 2014 in accordance with Michigan law have effectively been invalidated and repealed.

39.    Upon information and belief, prior to Governor Snyder's statement on March 26, 2014, Michigan had never retroactively imposed a marriage requirement to invalidate or "suspend" recognition of an existing marriage that was legally performed in Michigan.

**The U.S. Attorney General Grants Federal Recognition to the Marriages**

40.    On March 28, 2014, United States Attorney General Eric Holder issued the following written statement:

> I have determined that the same-sex marriages performed last Saturday in Michigan will be recognized by the federal government. These families will be eligible for all relevant federal benefits on the same terms as other same-sex marriages. The Governor of Michigan has made clear that the marriages that took place on Saturday were lawful and valid when entered into, although Michigan will not extend state rights and benefits tied to these marriages pending further legal proceedings. For purposes of federal law, as I announced in January with respect to similarly situated same-sex couples in Utah, these Michigan couples will not be asked to wait for

further resolution in the courts before they may seek federal benefits to which they are entitled.

Last June's decision by the Supreme Court in United States v. Windsor was a victory for equal protection under the law and a historic step toward equality for all American families.  The Department of Justice continues to work with its federal partners to implement this decision across the government.  And we will remain steadfast in our commitment to realizing our country's founding ideals of equality, opportunity, and justice for all.

**Plaintiffs Marsha Caspar and Glenna DeJong**

41.    Plaintiffs Marsha Caspar and Glenna DeJong have been in a committed relationship for 27 years.  Both lifelong residents of Michigan, they met through mutual friends at Michigan State University, where they were enrolled as graduate students.  Marsha works at Consumers Energy as a financial manager, and Glenna runs her own independent consulting business that develops instructional trainings for various businesses and professional settings.

42.    Marsha and Glenna have long wanted to marry as a way to publicly express their love and devotion to one another.  At times they considered moving to another state that allows marriage for same-sex couples, but they decided instead to remain in Michigan, waiting patiently and hopeful for the day they could wed. They even kept a filled-out application for a marriage license in their home in order to be prepared and ready for that day.

12

43.     When the *DeBoer* decision was issued on March 21, 2014,  Marsha heard the news at work.  She was ecstatic at the knowledge that she and Glenna could finally wed.  Glenna was at home when she heard the news and burst into tears of joy.

44.     The next morning Glenna woke at 6:30 a.m. and saw on her iPad that Ingham County Clerk's office would be open that morning to issue marriage licenses.  She and Marsha were the first couple to arrive at the Ingham County Clerk's office, and when the doors opened at 8:00 a.m. they became the first same-sex couple to get married in Michigan.

45.     Once their marriage had taken place, Marsha and Glenna were overwhelmed with joy by the fact that, after almost three decades, they were legally married.  When Governor Snyder announced several days later that the state would not recognize the 300 legal marriages that had taken place on March 22, 2014, Glenna and Marsha were both hurt and dumbfounded.  They could not understand how their marriage could be legal, yet they could not be afforded any rights or recognition.  As the couple publicly stated at the time, "It's akin to saying 'Rick Snyder, you were elected governor, but we're not giving you an office or letting you serve.'  There is no in-between.  We are not a 'skim milk marriage' as Supreme Court Justice Ruth Bader Ginsburg has so poignantly identified."

13

46.     Governor Snyder's statement, in addition to denying the couple the same dignity and respect afforded to other legally married couples, has created uncertainty and anxiety for the couple as to how their marriage will be regarded in practical terms.  Marsha suffers from a serious auto-immune disease that causes inflammation and restricts blood flow to various organs, which has affected both her mobility and kidney functioning.  She has been hospitalized in the past due to the disease and was very close to kidney failure several years ago.  Marsha and Glenna know of other same-sex couples who have been treated as legal strangers in hospitals, and they worry that this could happen to them should one of them be hospitalized in a facility that does not recognize their marriage.

47.     Additionally, Marsha has asked her employer to add Glenna to her health insurance plan, but no decision has been made because the status of their marriage is in legal limbo.  Glenna continues to pay the premiums for her own individual policy with Blue Cross Blue Shield, which is not as comprehensive as the coverage offered through Marsha's employer.  If the state were to recognize Glenna and Marsha's marriage, Glenna could get spousal coverage on Marsha's health insurance policy, a benefit that all other couples who were legally married in Michigan receive.

**Plaintiffs Clint McCormack and Bryan Reamer**

48.     Plaintiffs Clint McCormack and Bryan Reamer have been in a committed relationship for 22 years.  They first met when Bryan was attending college at Michigan Tech in the Upper Peninsula, where Clint and his family lived.  Clint is an insurance specialist for a psychology group and Bryan is a financial analyst at Ford Motor Company.

49.     Within minutes of learning of the *DeBoer* decision on March 21, 2014, Clint and Bryan made plans to obtain their marriage license and solemnize their marriage at the Oakland County Courthouse the following morning.  For over two decades years, they had been part of a relationship that their state had deemed second-class, and they were thrilled that the state was finally going to sanction their union and give them and their family the same recognition, privileges, benefits and protections that other married couples are provided.  When they got married on March 22, 2014, they felt that an enormous emotional weight was lifted.  Unfortunately, Governor Snyder's announcement that their marriage will not be recognized by the state has created new anxieties and problems for Clint, Bryan, and their children.

50.     Clint was raised in a very large family and always wanted to raise a large family with a life partner.  Clint and Bryan are currently charged with the care of 13 children.  Of the 13 children, six were jointly adopted by Clint and

Bryan out of the foster care system in New Jersey, where unmarried couples are permitted to jointly adopt children; four were adopted by Bryan alone in states that do not permit joint adoptions by unmarried couples; and three were placed in Clint and Bryan's care as foster children by the Michigan Department of Human Services ("DHS").

51.    The three children Clint and Bryan are raising as foster parents are sisters between the ages of one and three.  These children suffer from a number of health problems such as sickle cell anemia and fetal alcohol syndrome.  They were removed from the custody of their biological parents, whose legal rights to the children are likely to be terminated.  As soon as that process is complete, Clint and Bryan wish to legally adopt the three girls.

52.    It is important to Clint and Bryan that they jointly adopt these children so they will both be recognized as their legal parents.  That way, if something happens to one parent, the other parent will not be a legal stranger to his child. Additionally, their children will not suffer the stigma, humiliation, and emotional confusion of having only one legally recognized parent in a two-parent family. One of the children who was legally adopted only by Bryan is a fifteen-year-old boy who was emotionally devastated when he learned that his other father, Clint, is not recognized by law as his parent.

53.     Under state law, DHS must give final approval to adoptions that arise out of the foster care system.  But DHS has indicated on its Michigan Adoption Resource Exchange website that only married couples may jointly adopt foster children.  Because Governor Snyder has stated that Clint and Bryan's marriage on March 22, 2014 will not be recognized, they cannot jointly adopt their three foster children (or those girls' two brothers), thus denying them the legal protection of both parents.

54.     Clint would also like to adopt Bryan's four children so that these children have the legal protection of both their parents.  However, because the State of Michigan is not recognizing the validity of their marriage, Clint and Bryan fear that Clint will not be able to adopt Bryan's children.  And they fear that if something should happen to Bryan, Clint will become a legal stranger to the children he has been raising for many years.

**Plaintiffs Frank Colasonti, Jr. and James Barclay Ryder**

55.     Plaintiffs Frank Colasonti, Jr. and James Barclay Ryder have been in a committed relationship for 26 years, after they first met at the Metropolitan Community Church.  Frank is retired from Birmingham Public Schools, where he was a high school guidance counselor, and James works for Beaumont Health System.

56.     Frank and James attended the *DeBoer* trial in person and the couple was ecstatic to hear about the *DeBoer* decision on March 21, 2014.  They quickly made plans to obtain a marriage license and have their marriage solemnized at the Oakland County Courthouse on March 22, 2014.  They brought friends as witnesses to the event that would ensure that their committed relationship would finally be accorded the respect and recognition that Michigan law provides to all couples who were legally married in this state.

57.     Frank, age 61, is twelve years older than James.  Because there is a reasonable likelihood that he could die before James, he wants to make sure that his husband is provided for financially and will receive comprehensive health benefits.

58.     Under the Michigan Public School Employees Retirement System ("MPSERS"), the State of Michigan's Office of Retirement Services ("ORS") allows newly married retirees to adjust their pension disbursements to a lower monthly amount received in order to preserve future pension payments and health benefits for a surviving spouse.  This option is available only for legally married spouses, and it must be exercised within one year of marriage.

59.     As a result of Governor Snyder's announcement that Frank and James's marriage would not be recognized or afforded the benefits that all other couples who were legally married in Michigan receive under state law, Frank is

18

unable to adjust his pension plan to provide James with continued survivor's

benefits and health care in the event of Frank's death.  When Frank contacted ORS

regarding his March 22, 2014 marriage and his desire to provide pension benefits

to James, he was told by ORS staff that, pursuant to an internal memo, the ORS

can recognize only marriages between a man and a woman, and that the MPSERS

pension option for surviving spouses would therefore not be available to him while

the *DeBoer* stay remained in place or unless Governor Snyder changed his position

regarding the status of the March 22, 2014 marriages.

60.    When Governor Snyder announced that the state would not recognize

the legal marriages of same-sex couples who got married in Michigan on March

22, 2014, Frank and James felt a tremendous sense of disappointment that their

relationship had again been relegated to second-class status in their own state.

**Plaintiffs Samantha Wolf and Martha Rutledge**

61.    Plaintiffs Samantha Wolf and Martha "Marnee" Rutledge have been

in a committed relationship for two and a half years.  They met several years prior

to that through mutual friends.  Samantha works for the Michigan Department of

Community Health ("MDCH") as a manager of managed care data and systems

support.  Marnee is a substance abuse counselor and used to work for Michigan

Rehabilitation Services as a contract employee.

62.     In 2008, while riding her motorcycle, Marnee was hit by a van.  She suffered a closed head injury that has resulted in health complications, including neuro-fatigue.  She also experienced severe trauma to her foot resulting in orthopedic complications, including severe pain and arthritis, which affect her mobility.  Her doctors have told her that she will either need an ankle replacement or ankle fusion surgery.  As a result of her accident, Marnee is currently on Social Security disability and receives Medicare.

63.     Samantha and Marnee were thrilled when they heard about the *DeBoer* decision on March 21, 2014.  When the Ingham County Clerk's office announced that they would be open the next morning to issue marriage licenses, they quickly made plans to marry.  Waiting in line on March 22, 2014, they were surrounded by other couples and friends, all there to celebrate the freedom for same-sex couples to finally marry.

64.     Samantha wants Marnee to be covered under the health insurance policy that Samantha receives through her employment at MDCH.  Such coverage is normally available to spouses of MDCH employees and is far more comprehensive than the benefits Marnee currently receives under Medicare.  For example, Medicare does not provide vision or dental coverage and requires a $300 co-pay for emergency room visits.

65.     On the Monday morning following their marriage, Samantha requested health coverage for Marnee as her legal spouse.  However, she was informed that MDCH cannot recognize her legal marriage or provide Marnee with spousal health insurance benefits because of Governor Snyder's statement regarding the marriages of same-sex couples that took place on March 22, 2014.

66.     Samantha and Marnee were very disappointed when they heard Governor Snyder's announcement.  In addition to being denied immediate spousal health coverage that is far more comprehensive than what Medicare covers, Samantha and Marnee are being denied the dignity and recognition accorded to other couples who have legally married in Michigan.

**Plaintiffs James Anteau and Jared Haddock**

67.     Plaintiffs James Anteau and Jared Haddock have been in a committed relationship for 16 years.  They first met when they were neighbors in the same apartment building.  James is a high school French and Spanish teacher with the Farmington Public Schools, and Jared is a bankruptcy and family law attorney in private practice.

68.     James and Jared followed the *DeBoer* trial closely and were thrilled when Michigan's prohibition on same-sex couples marrying was found unconstitutional on March 21, 2014.  The couple had been wanting to be legally married for years because of their deep love for and commitment to one another.

21

They also believed that by marrying they would enjoy the legal protections and benefits associated with marriage. The couple obtained a marriage license and had their marriage solemnized at the Oakland County Clerk's office on March 22, 2014.

69.     Prior to their marriage, James had Jared covered under his health insurance policy through the Farmington school system as an "other eligible adult." Coverage under the "other eligible adult" status requires James to pay income taxes associated with the fair market value of Jared's coverage.

70.     After marrying Jared on March 22, 2014, James asked his employer to change Jared's status from "other eligible adult" to legal spouse. As a spouse, the premiums paid for Jared's insurance coverage would not be considered additional income to James for state income tax purposes. Although the Farmington schools' human resources staff were sympathetic and supportive, they informed James they could not change Jared's status to spouse because although their marriage was legal, it was not being recognized by the state for purposes of the benefits and rights tied to marriage.

71.     The peace of mind James and Jared felt when they got married has been undermined by their knowledge that, solely because they are a same-sex couple, they continue to be treated differently from other couples who have legally married in Michigan. James' straight co-workers who have married in Michigan

enjoy health care benefits for their different-sex spouses that are being denied to James and Jared as a same-sex couple.  James and Jared want their marriage to be recognized under state law on the same terms as other couples who have married in this state.

**Plaintiffs Kelly Callison and Anne Callison**

72.    Plaintiffs Kelly Callison and Anne Callison have been in a committed relationship for five years, having been introduced to each other by mutual friends. Anne is a public school teacher in Saline and Kelly is a stay-at-home mom.

73.    The couple wanted to start a family early in their relationship and they were overjoyed when Anne became pregnant and gave birth to the couple's son, now two years old.  After their son's birth, the couple met with an attorney to find out if Kelly could adopt him and thus provide their son with the legal protection of both parents.  They were informed that a second-parent or step-parent adoption in Michigan was limited to married couples and since they could not marry, Kelly could not adopt their son.  Consequently, Anne is their son's sole legal parent. Despite the fact that Kelly has co-parented and raised her son since birth, in the eyes of Michigan law she is a stranger to her son.  Should something happen to Anne, there is no guarantee that Kelly could continue to raise their son and make important decisions about his upbringing.

74.     After waiting several years for the right to marry, Kelly and Anne were thrilled when Michigan's ban on marriage for same-sex couples was struck down, and they immediately made arrangements to be married the next day at the Washtenaw County Clerk's office.  Their family, friends, and their son were in attendance as they solemnized their marriage in the clerk's office on March 22, 2014.

75.     After they got married, Anne contacted her employer and asked whether Kelly could be covered under her health insurance policy as her spouse. Staff from the Saline school system's human resources department responded that because Governor Snyder had stated that their marriage would not be recognized or receive any state benefits under state law, they could not provide health coverage to Kelly as Anne's spouse.

76.     Kelly currently pays for her own private health insurance policy, which costs $300 per month in premiums.  The coverage she has under this policy is not nearly as comprehensive as the coverage she would receive through Anne's employer as her spouse.  Unlike the policy provided to Anne through the Saline school system, Kelly has no prescription, dental or vision coverage and has a $100 co-pay on emergency room visits.

77.     Kelly and Anne both felt hurt and disheartened by Governor Snyder's statement that although their marriage was legal, they are not entitled to the same

recognition and protections afforded to different-sex couples who have married in Michigan. The Governor's statement has put them back into a world of uncertainty—uncertainty as to whether their son will have the security of legally-recognized relationships with both his moms, and uncertainty as to whether their Michigan marriage will ever carry any meaning under state law.

**Plaintiffs Bianca Racine and Carrie Miller**

78.    Plaintiffs Bianca Racine and Carrie Miller have been in a committed relationship for the past three and a half years. They first met at a bar in Detroit, where Carrie was doing her homework for school and Bianca struck up a conversation with her. Bianca has been in the National Guard for almost nine years and was deployed in Kosovo for two years as part of a NATO unit. She currently works at Chrysler as a contract employee data manager while studying environmental law with funds provided under the G.I. Bill. Carrie works as an office assistance for Oakland University and has been accepted into Wayne State University's School of Library and Information Science.

79.    Bianca is a politically active member of the LGBT community and remembers the joyous and momentous occasion when Massachusetts first began permitting same-sex couples to marry. She always hoped that she would meet someone with whom she could share a lifetime commitment in marriage, and she found that person in Carrie.

80.     The couple was thrilled when the *DeBoer* decision was announced on March 21, 2014, and they immediately made plans to obtain a marriage license and have their marriage solemnized at the Oakland County Clerk's office the next day.

81.     Although their families could not attend their wedding on such short notice because they live far away, Bianca and Carrie felt an incredible sense of solidarity and community with the other same-sex couples who lined up to marry at the Oakland County Clerk's office on March 22, 2014.  The joy of their marriage was tempered by Governor's Snyder's subsequent announcement that they would not be given the recognition or benefits that all other couples who are legally married in Michigan receive.

82.     The state's position regarding the March 22, 2014 marriages has created immediate practical problems for Bianca and Carrie that other couples who have married in Michigan have not experienced.  For example, because both Bianca and Carrie will be full-time students this fall, they are concerned that they may encounter some financial hardships.  Both the Michigan Veteran's Trust Fund and Michigan National Guard Family Support Fund provide temporary assistance to wartime veterans and their families residing in Michigan who are experiencing financial hardship.  Families are defined as spouses and financial dependents, and the ability for Bianca and Carrie to be recognized as a family for these programs is dependent upon whether their marriage is recognized in Michigan.

83.     Bianca recently contacted the Michigan office of the Army National Guard Judge Advocate General ("JAG") regarding how her marriage affects the availability of financial aid programs for Carrie.  The JAG office informed her that although all federal assistance programs would be available to the couple (pursuant to United States Attorney General Eric Holder's statement that the federal government would recognize the Michigan marriages), any programs funded by the State of Michigan for the families of veterans and military personnel are not being offered to same-sex spouses as a result of Governor Snyder's announcement regarding the March 22, 2014 marriages.  The JAG office also told Bianca that, although there are both federal and state Veterans Affairs agencies, only the federal VA will recognize Carrie as Bianca's spouse for the purpose of providing services that all military spouses are entitled to receive.

84.     Bianca and Carrie were very upset to learn that despite Bianca's service to her country and to the State of Michigan through the National Guard, in the eyes of Michigan law, her marriage to Carrie has no legal significance. Governor Snyder's statement is also problematic for the couple in that they wish to start a family soon, but are concerned that both of them would not be legally recognized as the legal parents of their children.

**Plaintiffs Martin Contreras and Keith Orr**

85.    Plaintiffs Martin Contreras and Keith Orr have been in a committed relationship for 28 years.  The couple met in Ann Arbor one evening after Martin had finished his shift at the Mexican restaurant he owned and operated with this mother, and after Keith had finished playing a softball game in a local league. After becoming a couple, Keith joined Martin in operating the Mexican restaurant together in Ann Arbor.  In 1995 they opened the Aut Bar, a popular bar and restaurant in Ann Arbor.  Since then they have purchased several buildings in Ann Arbor that are now home to an LGBT community center and an LGBT bookstore.

86.    Martin and Keith are prominent members of the Ann Arbor LGBT community, known not only for their business acumen, but also for their dedication and generosity to various charitable and political causes.  The couple are dedicated to the well-being and welfare of both the City of Ann Arbor and the LGBT community.

87.    When Martin and Keith learned that the *DeBoer* case might result in the freedom to marry for same-sex couples in Michigan, they decided that they would want to get married as soon as legally possible.  They worked with local LGBT community advocates to ask that the Washtenaw County Clerk's office make marriage licenses available as soon as the law allowed.

88.     On March 22, 2014, Martin and Keith were the fifth couple in line at the Washtenaw County Clerk's office, obtaining their wedding license and having their marriage solemnized that day.  Martin and Keith were thrilled to finally be able to have their relationship recognized under Michigan law.  After getting married they returned to the Aut Bar, worked the lunch and dinner shifts until midnight  (proudly announcing to customers that they were newlyweds), and then toasted each other with a glass of champagne.

89.     Martin and Keith were disappointed and confused by Governor Snyder's statement that although their marriages were legal, they would not be recognized by the state or accorded any benefits or protections that other marriages receive under state law.  They worry how Governor Snyder's statement will impact their ability to be recognized as legal spouses for purposes of state income taxes, as well as their health insurance.  They believe that the Governor's statement has created confusion, uncertainty, and a lack of clarity for a status they had finally achieved on March 22, 2014 after waiting almost three decades: legal marriage.

## CAUSES OF ACTION

90.     Under 42 U.S.C. § 1983, state actors are liable at law or equity for their acts or omissions undertaken under color of law which deprive any person of the rights secured by the Constitution and laws of the United States.

91.     Defendants are state actors and, at all times relevant to this Complaint, were acting or failing to act, are acting or failing to act, or will act or fail to act under color of law.

## COUNT ONE
## SUBSTANTIVE DUE PROCESS

92.     The Fourteenth Amendment to the United States Constitution provides that no State "shall deprive any person of life, liberty, or property, without due process of law."

93.     It has long been recognized that the Due Process Clause guarantees more than fair process; it includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests.

94.     The Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in our Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.

95.     The liberty protected by the Due Process Clause includes the right to marry, establish a home, bring up children, and make personal decisions relating to procreation, contraception, family relationships, life partnerships, and education.  It includes protection from unwarranted governmental intrusion into the private realm of family life, the most intimate and personal choices persons make in their

lifetime, and decisions central to personal dignity and autonomy.  It prohibits laws that demean our private lives or deny our dignity as free persons.  And it includes our rights generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free persons.

96.     Substantive due process protects the sanctity of the family because the institution of family is deeply rooted in our Nation's history and tradition.  The relationship of love and duty in a recognized family unit is therefore an interest entitled to constitutional protection.

97.     Once a constitutionally protected relationship is established, it acquires even more protection under the Due Process Clause.  It has long been recognized at common law, and is deeply rooted in our Nation's history and tradition, that a legal marriage, once it is entered into, vests the married couple with benefits and rights that cannot be taken away by a legislative or executive act.

98.     Regardless of the ultimate outcome of the *DeBoer* litigation, the Due Process Clause protects Plaintiffs' marriages, legal and valid under Michigan law when they were entered into, from being retroactively invalidated by the state. Defendants violate, have violated, and/or would violate Plaintiffs' due process rights by refusing to recognize these marriages or by denying Plaintiffs and their families the dignity, privileges or benefits that all legally married couples and their families deserve and are entitled to under the law.

## COUNT TWO
## EQUAL PROTECTION

99.     The Fourteenth Amendment to the United States Constitution also provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws."

100.    The Equal Protection Clause is a directive that all persons similarly situated should be treated alike.  Under a rational-basis standard of review, unequal treatment is more likely to be struck down as unconstitutional when it inhibits or impairs personal relationships.  A heightened level of scrutiny applies where the classification intrudes upon a fundamental right.  Further, withdrawing from a disfavored group, but no other group, legal protections or benefits, or a designation that carries significant societal meaning or benefits, is more suspect than declining to extend those protections or benefits, or that designation, in the first place.

101.    Marriage is a fundamental right, and married status is a far-reaching legal acknowledgment of the intimate relationship between two people, a relationship worthy of dignity in the community equal with all other marriages. The Equal Protection Clause is violated where, as here, a state's officials refuse to treat all married couples alike; identify a subset of state-sanctioned marriages and make them unequal; deprive some couples who were legally married in that state, but not other couples who were legally married in that state, of the recognition, benefits, rights and privileges that are an essential part of married life; and tell

32

those couples, and all the world, that their otherwise valid marriages are unworthy of state recognition.

102.   Regardless of the ultimate outcome of the *DeBoer* litigation, the Equal Protection Clause protects Plaintiffs' marriages, legal and valid under Michigan law when they were entered into, from being denied the same recognition, benefits, rights and privileges given to heterosexual couples who were legally married in Michigan.  Defendants' withdrawal or repeal of the recognition, benefits, rights and privileges of Plaintiffs' marriages because Plaintiffs are same-sex couples, and Defendants' refusal to provide Plaintiffs and their families with equal treatment and recognition, violates, has violated, and/or would violate Plaintiffs' rights to the equal protection of the laws.

## RELIEF REQUESTED

Based on the foregoing, Plaintiffs request that this Court:

    a.    assert jurisdiction over this matter;

    b.    enter judgment in favor of Plaintiffs and against Defendants;

    c.    provide declaratory relief as follows:

        i.    declare that article I, section 25 of the Michigan Constitution, otherwise known as the Michigan Marriage Amendment, and its implementing or associated statutes, are unconstitutional as applied to the marriages of couples, including Plaintiffs, who were legally married in Michigan and whose marriages were valid at the time they were entered into; and

33

    ii.    declare that Defendants' refusal to recognize the marriages of couples, including Plaintiffs, who were legally married in Michigan and whose marriages were valid at the time they were entered into, and refusal to afford those couples and their families, including Plaintiffs and their families, with all the benefits, rights and privileges given to other legally married couples and their families under Michigan law, on account of those couples being of the same sex, violates the rights of those couples and their families, including Plaintiffs and their families, to due process of law and the equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution;

d.    provide preliminary and permanent injunctive relief as follows:

    i.    enjoin Defendants from enforcing Article I, section 25 of the Michigan Constitution, otherwise known as the Michigan Marriage Amendment, and its implementing or associated statutes, against couples, including Plaintiffs, who were legally married in Michigan and whose marriages were valid at the time they were entered into; and

    ii.    enjoin Defendants from refusing to recognize the marriages of couples, including Plaintiffs, who were legally married in Michigan and whose marriages were valid at the time they were entered into, and from refusing to afford those couples and their families, including Plaintiffs and their families, with all the benefits, rights and privileges given to other legally married couples and their families under Michigan law, on account of those couples being of the same sex;

e.    award Plaintiffs costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

f.    provide any other relief deemed just and equitable.

Respectfully submitted,

/s/ Jay D. Kaplan

Andrew Nickelhoff (P37990)            Jay D. Kaplan (P38197)
Cooperating Attorney,                       Daniel S. Korobkin (P72842)
American Civil Liberties Union           Brooke A. Merriweather-Tucker
   Fund of Michigan                          Michael J. Steinberg (P43085)
Sachs Waldman PC                         Kary L. Moss (P49759)
2211 E. Jefferson Ave., Ste. 200        American Civil Liberties Union Fund
Detroit, MI 48207                             of Michigan
(313) 496-9429                              2966 Woodward Ave.
anickelhoff@sachswaldman.com        Detroit, MI 48201
                                                   (313) 578-6812
Julian Davis Mortenson                    kaplan@aclumich.org
   (E.D. Mich. admission pending)      dkorobkin@aclumich.org
Cooperating Attorney,                       msteinberg@aclumich.org
American Civil Liberties Union
   Fund of Michigan                          John A. Knight
University of Michigan Law School[*]    American Civil Liberties
625 S. State St.                                 Union Foundation
Ann Arbor, MI 48109                        180 N. Michigan Ave., Ste. 2300
(734) 763-5695                              Chicago, IL 60601
jdmorten@umich.edu                       (312) 201-9740
                                                   jaknight@aclu.org

   [*] Institution included for
      identification purposes only

Attorneys for Plaintiffs

Dated: April 14, 2014

35