UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARSHA CASPAR, et al.,

          Plaintiffs,

                                      Case No. 14-CV-11499

v.

                                      HON. MARK A. GOLDSMITH

RICHARD SNYDER, et al.,

          Defendants.

_____/

## OPINION AND ORDER
## (1) GRANTING PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION (Dkt. 17), AND (2) DENYING DEFENDANTS' MOTIONS FOR A STAY (Dkt. 20), TO DISMISS (Dkt. 21), AND TO CONSOLIDATE CASES (Dkt. 27)

## I.  INTRODUCTION

The fundamental question in this case is whether officials of the State of Michigan are violating the United States Constitution by refusing to recognize the marital status of same-sex couples whose marriages were solemnized pursuant to Michigan marriage licenses issued in accordance with Michigan law in effect at the time of the marriages.  This Court concludes that the continued legal validity of an individual's marital status in such circumstances is a fundamental right comprehended within the liberty protected under the Due Process Clause of the Fourteenth Amendment.  Even though the court decision that required Michigan to allow same-sex couples to marry has now been reversed on appeal, the same-sex couples who married in Michigan during the brief period when such marriages were authorized acquired a status that state officials may not ignore absent some compelling interest — a constitutional hurdle that the defense does not even attempt to surmount.  In these circumstances, what the state has joined together, it may not put asunder.

1

For the reasons discussed fully below, the Court grants a preliminary injunction requiring the recognition of such marriages and rejects the defense efforts to dismiss, stay, or consolidate this case.

## II. BACKGROUND

Plaintiffs are eight same-sex couples who were married during a brief window of time — lasting only a few hours on March 22, 2014 — one day after the decision of another judge of this District holding that Michigan's refusal to authorize same-sex marriage was unconstitutional. See DeBoer v. Snyder, 973 F. Supp. 2d 757 (E.D. Mich. 2014) (Friedman, J.). That district court decision followed a nine-day bench trial addressing whether Michigan's ban on same-sex marriage violated the due-process and equal-protection guarantees of the United States Constitution. The ban is embodied in a state constitutional amendment adopted by a voter referendum in 2004, as well as in earlier-adopted state statutory provisions.[1] Applying rational-basis review, the district court concluded that the ban denied same-sex couples the equal protection of the laws, because the ban did not advance any conceivable legitimate state interest. Id. at 768. The district court did not address the DeBoer defendants' conditional request for a

---

[1] See Mich. Const. art. 1, § 25 ("To secure and preserve the benefits of marriage for our society and for future generations of children, the union of one man and one woman in marriage shall be the only agreement recognized as a marriage or similar union for any purpose."); Mich. Comp. Laws § 551.1 ("Marriage is inherently a unique relationship between a man and a woman. As a matter of public policy, this state has a special interest in encouraging, supporting, and protecting that unique relationship in order to promote, among other goals, the stability and welfare of society and its children. A marriage contracted between individuals of the same sex is invalid in this state."); Mich. Comp. Laws § 551.2 ("So far as its validity in law is concerned, marriage is a civil contract between a man and a woman, to which the consent of parties capable in law of contracting is essential. Consent alone is not enough to effectuate a legal marriage on and after January 1, 1957."). Although these enactments are of a more recent vintage, Michigan's definition of marriage, as a relationship between a man and a woman, goes back to Michigan's territorial days. DeBoer v. Snyder, 772 F.3d 388, 396 (6th Cir. 2014) (citing 1 Laws of the Territory of Michigan 646, 646 (1871)).

stay pending appeal in the event of an adverse ruling, which was orally made at the close of the trial.

That late Friday-afternoon decision prompted four local county clerks to open their offices the next day, waive the traditional three-day waiting period, and immediately issue marriage licenses. Plaintiffs were among some 300 same-sex couples who received licenses and solemnized their marriages that Saturday. The window during which same-sex marriage was lawful in Michigan closed abruptly on Saturday afternoon, when the United States Court of Appeals for the Sixth Circuit issued a temporary stay (later converted to a full stay pending appeal) of the district court's decision. See DeBoer v. Snyder, No. 14-1341, 3/22/14 Order at 1 (Dkt. 11-2) ("To allow a more reasoned consideration of the motion to stay, it is [ordered] that the district court's judgment [be] temporarily stayed until Wednesday, March 26, 2014."); id., 3/25/14 Order at 3 (Dkt. 22-1) (granting the defendants' "motion to stay the district court's order pending final disposition of [the defendants'] appeal by this court").

Following issuance of the full stay, Michigan Governor Richard Snyder, a defendant in both DeBoer and this action, announced a policy of refusing to recognize the marriages for any purpose under the law, while conceding that the marriages had been lawfully entered into in accordance with Michigan law in effect at the time of the marriages:

> After comprehensive legal review of state law and all recent court rulings, we have concluded that same-sex couples were legally married at county clerk offices in the time period between U.S. District Judge Friedman's ruling and the 6th U.S. Circuit Court of Appeals temporary stay of that ruling.
>
> In accordance with the law, the U.S. Circuit Court's stay has the effect of suspending the benefits of marriage until further court rulings are issued on this matter. The couples with certificates of marriage from Michigan courthouses last Saturday were legally married and the marriage was valid when entered into. Because the stay brings Michigan law on this issue back into effect, the

3

> rights tied to these marriages are suspended until the stay is lifted
> or Judge Friedman's decision is upheld on appeal.

Compl. ¶ 36 (3/26/14 Written Statement of Governor's Office) (Dkt. 1).  The Governor reiterated

the policy at a press conference shortly after his written statement was issued:

> [F]irst of all, in respect to the marriages themselves, the 300
> marriages on that Saturday, we believe those are legal marriages
> and valid marriages.  The opinion had come down.  There had not
> been a stay in place.  So with respect to the marriage events on that
> day, those were done in a legal process and were legally done.
>
> The stay being issued that next night really makes it more
> complicated and that's why I asked you to bear with me-- is,
> although the marriages were legal, what the stay does is reinstate
> Michigan law, and under Michigan law, it says the State of
> Michigan will not recognize the fact that they're married because
> they're of the same sex.  So what we have is a situation here where
> the legal marriages took place on Saturday but, because of the stay
> that the operation of law is such that we won't recognize the
> benefits of that marriage until there's a removal of the stay or
> there's an upholding of the judge's opinion by the Court of
> Appeals or a higher court.

Compl. ¶ 37.

Plaintiffs then filed this action alleging due-process and equal-protection violations

against four state officials in their official capacities: the Governor and the heads of three

executive departments with responsibilities over benefits that Plaintiffs claim will be impaired by

the non-recognition policy.  Plaintiffs allege intangible harms, such as loss of dignity, id. ¶ 98,

feelings of "uncertainty and anxiety," id. ¶ 46, "disappointment," id. ¶ 60, loss of "peace of

mind," id. ¶ 71, as well as "hurt" and "dishearten[ment]," id. ¶ 77.  They also allege more

tangible harms.  Several Plaintiffs applied for health-insurance benefits based on their marital

status, only to be told by their employers that the applicants could not be recognized as married

under their insurance plans because of the state's non-recognition policy.  Id. ¶¶ 65, 75.  Other

Plaintiffs allege impairment of their efforts to adopt children together, because Michigan will not

allow two single persons to adopt jointly the same child.  Id. ¶¶ 54, 73.  Still others allege loss of spousal-pension benefits, id. ¶ 59, state income-tax benefits, id. ¶ 70, and financial-aid benefits, id. ¶ 83.

Plaintiffs filed a motion for a preliminary injunction (Dkt. 17), seeking an order requiring Defendants to recognize their marriages and the marriages of the other same-sex couples who were married before the issuance of the Sixth Circuit stay.  Defendants opposed the motion (Dkt. 22), claiming principally that the Sixth Circuit stay reinstituted Michigan's ban on same-sex marriage, and that the continued validity of Plaintiffs' marriages was tied to the ultimate appellate disposition of DeBoer.  Defendants also filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (6) (Dkt. 21), raising several other defenses, including Eleventh Amendment immunity, standing, ripeness, failure to state a claim, and the absence of sufficient grounds for declaratory relief.  In addition, Defendants filed a motion for a stay of this action until resolution of the appeal in DeBoer (Dkt. 20), as well as a motion to consolidate this case with a separate case pending before another judge of this District, Blankenship v. Snyder, No. 14-12221 (Dkt. 27).

The Sixth Circuit has now spoken in DeBoer.  DeBoer v. Snyder, 772 F.3d 388 (6th Cir. 2014).  It reversed the district court's decision and upheld Michigan's ban on same-sex marriage (as well as the bans in Tennessee, Kentucky, and Ohio).  It concluded that the Supreme Court has already held that same-sex couples have no constitutional right to marry, by virtue of the Supreme Court's one-line order in Baker v. Nelson, 409 U.S. 810 (1972), which dismissed the appeal of a lawsuit challenging a Minnesota same-sex marriage ban because it did not raise "a substantial federal question."  DeBoer, 772 F.3d at 400 (quotation marks omitted).  Rejecting the theory that United States v. Windsor, 133 S. Ct. 2675 (2013) overturned Baker when the

Supreme Court struck down the Defense of Marriage Act of 1996 for the act's refusal to recognize same-sex marriages allowed in some states, the Sixth Circuit examined numerous grounds urged in support of same-sex marriage and found all lacking.  Notably, for purposes of our case, the Sixth Circuit did not address the question presented here: whether same-sex couples who were married pursuant to Michigan marriage licenses issued under Michigan law — as it stood at the time their marriages were solemnized — may, consistent with the Constitution, be stripped by the state of their marital status.  The plaintiffs in DeBoer have filed a petition for a writ of certiorari with the Supreme Court, DeBoer v. Snyder, 772 F.3d 388 (6th Cir. 2014), petition for cert. filed, No. 14-571 (U.S. Nov. 14, 2014), which remains pending at this time.

The preliminary injunction motion and the motion to dismiss are discussed below in tandem, as they both require inquiry into the viability of Plaintiffs' claims.  Defendants' motions to stay and to consolidate are discussed thereafter.

### III.  ANALYSIS

#### A.  Motions for a Preliminary Injunction and to Dismiss

##### 1.  Standards of Decision

The standard for a preliminary injunction is well known: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  Typically, no one factor is dispositive; rather they are to be considered as an integrative whole.  Liberty Coins, L.L.C. v. Goodman, 748 F.3d 682, 690 (6th Cir. 2014) ("Each of these factors should be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." (quotation marks and brackets omitted)).

However, where a plaintiff demonstrates a likelihood of success on a claimed constitutional violation, a preliminary injunction is nearly always appropriate.  Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012) ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, the likelihood of success on the merits often will be the determinative factor." (quotation marks omitted)).  As the discussion below demonstrates, all of the factors point decidedly in favor of granting an injunction in this case.

In a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), "the plaintiff has the burden of proving jurisdiction."  Moir v. Greater Cleveland Reg'l Transit Auth., 895 F.2d 266, 269 (6th Cir. 1990).  Challenges to subject-matter jurisdiction fall into two general categories: "facial attacks" — which argue that the pleading allegations are insufficient — and "factual attacks" — which challenge the factual veracity of the allegations.  United States v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994).  On a motion raising a facial attack, "the court must take the material allegations of the petition as true and construed in the light most favorable to the nonmoving party."  Id.  In reviewing a motion raising a factual attack, "the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  Id.

In evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "[c]ourts must construe the complaint in the light most favorable to plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint states a plausible claim for relief."  Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010) (quotation marks, brackets, and citations omitted).  To survive a motion to dismiss, a complaint must plead specific factual allegations, and not just legal conclusions, in support of each claim.  Ashcroft v. Iqbal, 556 U.S.

662, 678–679 (2009).   A complaint will be dismissed unless, when all well-pled factual allegations are accepted as true, the complaint states a "plausible claim for relief."  Id. at 679.

With these standards in mind, the Court begins by examining the four factors for a preliminary injunction.

### 2.   Likelihood of Success on the Merits

#### a.   Due Process

The Due Process Clause of the Fourteenth Amendment, which provides that no person shall be deprived of "life, liberty or property without due process of law," protects more than fair process.  Collins v. City of Harker Heights, Tex., 503 U.S. 115, 125 (1992).  The doctrine of substantive due process safeguards individual liberty against "certain government actions regardless of the fairness of the procedures used to implement them."  Daniels v. Williams, 474 U.S. 327, 331 (1986).  Determining which spheres of human endeavor deserve protection under the Due Process Clause from which types of government encroachment is a query that has occupied the judicial mind since the late 19th century.  See McDonald v. City of Chicago, Ill., 561 U.S. 742, 759 (2010).

Because an overly expansive view of substantive due process heightens the risk that judges may impose their own legislative preferences in the guise of interpreting the Due Process Clause, courts must exercise "caution and restraint."  Moore v. City of E. Cleveland, Ohio, 431 U.S. 494, 502 (1977).  Restraint, however, "does not counsel abandonment."  Id.

The admonishment of restraint is illustrated by the Court's general disinclination to afford heightened judicial scrutiny under the Due Process Clause to routine legislation touching on economic and social affairs.  McDonald, 561 U.S. at 879 (Stevens, J., dissenting) ("Ever since the deviant economic due process cases were repudiated, our doctrine has steered away from

8

laws that touch economic problems, business affairs, or social conditions . . . ." (quotation marks, brackets, and citations omitted)).  Rather, heightened judicial scrutiny under the Due Process Clause is afforded to those claimed infringements that pertain to "'fundamental' liberty interests." Reno v. Flores, 507 U.S. 292, 301-302 (1993).

To qualify for such heightened scrutiny, the rights claimed to be fundamental must be profoundly tethered to the history and traditions of our Nation.  Washington v. Glucksberg, 521 U.S. 702, 720-721 (1997) ("[W]e have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." (quotation marks and citations omitted)). Justice John Harlan II famously articulated the balance that courts must strike in determining whether rights are fundamental:

> Due process has not been reduced to any formula; its content cannot be determined by reference to any code.  The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society.  If the supplying of content to this Constitutional concept has of necessity been a rational process, it certainly has not been one where judges have felt free to roam where unguided speculation might take them.  The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke.  That tradition is a living thing.

Poe v. Ullman, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting).

The Supreme Court has long recognized that government actions impinging on significant dimensions of family life — and especially marriage — implicate fundamental rights. See, e.g., Cleveland Bd. of Educ. v. LaFleur, 414 U.S. 632, 639-640 (1974) (in invalidating mandatory maternity leave, stating that "[t]his Court has long recognized that freedom of

personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment"); <u>Loving v. Virginia</u>, 388 U.S. 1, 12 (1967) (in striking down anti-miscegenation law, stating that "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men"); <u>Griswold v. Connecticut</u>, 381 U.S. 479, 486 (1965) (in striking down contraceptive ban, stating that the right of marital privacy is "older than the Bill of Rights—older than our political parties, older than our school system"); <u>Meyer v. Nebraska</u>, 262 U.S. 390, 399 (1923) (in striking down statute criminalizing the teaching of a foreign language to young children, stating that the liberty guaranteed by the Fourteenth Amendment includes "the right . . . to marry, establish a home and bring up children"); <u>Skinner v. Oklahoma</u>, 316 U.S. 535, 541 (1942) (in striking down a statute allowing sterilization of criminals, stating that the "legislation [] involves one of the basic civil rights of man[;] [m]arriage and procreation are fundamental to the very existence and survival of the race").

The present case implicates a fundamental right associated with marriage, as a liberty interest protectable under the Due Process Clause.  More specifically, this case implicates the right to <u>maintain</u> one's marital status once it has been lawfully acquired under the laws of the state seeking to defeat it.  Importantly, this case does not concern the right to <u>acquire</u> the status of being married, which was the issue addressed by the Sixth Circuit in <u>DeBoer</u>.

Although no Supreme Court case has squarely addressed the question of maintaining one's marital status, the compelling inference to be drawn from the cases addressing marriage and family is that the liberty interest being protected is the on-going relationship that the parties expect — or at least, fervently hope — will endure so long as they both live.  In other words, what is "fundamental" is not simply the snapshot moment when vows are spoken, but the

lifetime of committed intimacy that couples expect will follow.  As the Court taught in <u>Lehr v. Robertson</u>,

> [t]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association . . . .

463 U.S. 248, 261 (1983) (quoting <u>Smith v. Org. of Foster Families for Equal. & Reform</u>, 431 U.S. 816, 844 (1977) (quoting <u>Wisconsin v. Yoder</u>, 406 U.S. 205, 231-233 (1972))) (quotation marks omitted); <u>see</u> <u>also</u> <u>Windsor</u>, 133 S. Ct. at 2692 (recognizing that marital "status is a far-reaching legal acknowledgement of the intimate relationship between two people"); <u>Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte</u>, 481 U.S. 537, 545 (1987) ("The Court has recognized that the freedom to enter into and carry on certain intimate or private relationships is a fundamental element of liberty protected by the Bill of Rights. . . . The intimate relationships to which we have accorded constitutional protection include marriage." (citations omitted)); <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 619-620 (1984) (recognizing that "[f]amily relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life[,]" and "relationships with these sorts of qualities are likely to reflect the considerations that have led to an understanding of freedom of association as an intrinsic element of personal liberty"); <u>Pi Lambda Phi Fraternity, Inc. v. Univ. of Pittsburgh</u>, 229 F. 3d 435, 441 (3d Cir. 2000) ("Family relationships are the paradigmatic form of protected intimate associations.").  Thus, it is the on-going union — not simply the initial joinder — that is "essential to the orderly pursuit of happiness."  <u>Loving</u>, 388 U.S. at 12.

Defendants do not expressly reject this principle.  Nor do Defendants dispute that their refusal to accord legal recognition to Plaintiffs' marital status amounts to a deprivation of Plaintiffs' marital status.  Nor could Defendants so argue, given that the denial of legal recognition to a marital status eviscerates that status.  To state the obvious: two people whose marriage was validly solemnized, but who are not permitted to enjoy any of the benefits or rights of married people, are unquestionably the functional equivalent of unmarried people.[2]

There is also no question that Defendants' refusal to recognize the marital status of persons lawfully married pursuant to Michigan marriage licenses issued under Michigan law — as that law stood at the time the marriages were solemnized — is entirely unprecedented.  In the nine briefs submitted by them to date in this action, Defendants have failed to provide a single court decision approving a state's effort to vitiate the marital status of a couple lawfully married under that state's law.  By contrast, there is a long history of court decisions and legislative enactments, under a variety of theories, reflecting a national consensus rejecting the view that a person's marital status may be invalidated by a state after it was lawfully acquired under that state's law.

One manifestation of this consensus is the plethora of court decisions that interpret statutes modifying marriage-eligibility requirements so as to exempt pre-existing marriages that would otherwise be invalidated under the change in law.  For example, in Cook v. Cook, 104 P.3d 857 (Ariz. Ct. App. 2005), the court addressed a change in Arizona law that declared void out-of-state marriages between first cousins — unions that had been previously recognized under

---

[2] Defendants do argue that there is no constitutional right to some of the benefits Plaintiffs cannot obtain as a result of the non-recognition policy, such as pension and insurance benefits or the right to adopt jointly as a couple.  Defs. Resp. to Inj. Mot. at 13 (Dkt. 22).  But Plaintiffs are not asserting that the loss of those rights amounts to a violation of due process.  Rather, they claim — rightly — that the loss of recognized marital status produces tangible harm in the form of those lost benefits.

Arizona law.  Although the "plain" language of the statute converted the litigants' pre-existing marriage from valid to void, the court interpreted the statutory amendment as prospective only, because, otherwise, the litigants' "vested" right in their marriage would be destroyed.  Id. at 864-865, 866.

To the same effect is Cavanaugh v. Valentine, 41 N.Y.S.2d 896, 898 (Sup. Ct. 1943), where the court interpreted a statute abolishing common-law marriages as applying prospectively only, because, otherwise, the pre-existing union would be nullified, amounting to the impairment of a contract, in violation of Article 1, Section 10 of the United States Constitution.

Similarly, in Hatfield v. United States, 127 F.2d 575 (2d Cir. 1942), the court interpreted an amendment to New York's domestic relations law as operating prospectively only, based on the doctrine of non-retroactivity, which presumes that legislative enactments apply prospectively. Id. at 577-578.  The amendment made a second or subsequent marriage void, where the spouse from a prior marriage had disappeared for five or more years, unless a divorce decree had been secured prior to the remarriage; the original statute had only made the remarriage voidable, and only as of the date it was invalidated by court decree.  Id.  The Second Circuit relied on an earlier New York decision, Atkinson v. Atkinson, 203 N.Y.S. 49 (App. Div. 1924), which had concluded: "It cannot be held that the Legislature intended that a marriage performed in accordance with the law existing at the time of performance can be declared void because of a subsequent change in the statute."  203 N.Y.S. at 52.[3]

---

[3] See also Succession of Yoist, 61 So. 384, 385 (La. 1913) (stating that a "statute prohibited marriages between white persons and persons of color, but had no retroactive effect as to marriages of that kind which had been previously consummated"); In re Ragan's Estate, 62 N.W.2d 121, 121-122 (Neb. 1954) ("The statute [providing that common-law marriages are not recognized in Nebraska] had no retroactive aspects and common-law marriages entered into and consummated prior to the adoption of the act are valid."); Weisberg v. Weisberg, 98 N.Y.S. 260, 261-262 (App. Div. 1906) (holding that a statute making marriages between uncle and niece

In the same context as the present case, courts have rejected state efforts to nullify a same-sex couple's marital status once it was legally acquired under that state's law.  In Strauss v. Horton, 207 P.3d 48, 59 (Cal. 2009), the California Supreme Court addressed whether a voter-adopted state constitutional amendment prohibiting the recognition of same-sex marriages should be applied to the estimated 18,000 same-sex couples who had married after the issuance of an earlier court decision recognizing their right to marry.  The court refused to give the amendment retroactive application, to avoid a due-process violation under the California Constitution premised on the deprivation of vested rights.  Id. at 121-122.

Following the California Supreme Court's lead, the district court in Evans v. Utah, 21 F. Supp. 3d 1192 (D. Utah 2014), rejected state efforts to deny recognition to same-sex marriages solemnized in the period between the issuance of a court order recognizing their right to marry and the date the United States Supreme Court stayed the effect of the order pending appeal.  Invoking the doctrine of vested rights, the Evans court concluded that the same due-process concerns voiced in Strauss were present: "The State's decision to retroactively apply its marriage bans and place Plaintiffs' marriages 'on hold' infringes upon fundamental constitutional

---

incestuous could not be applied retroactively; otherwise it would be unconstitutional as an impairment of the obligation of contracts); Gilels v. Gilels, 287 N.Y.S. 5, 9 (Sup. Ct. 1935) (declining to apply retroactively marriage amendment allowing annulment based on insanity); Stackhouse v. Stackhouse, 862 A.2d 102, 107 (Pa. Super. Ct. 2004) (in "grandfathering" as valid common-law marriages established before abolishment by court decision, stating that the Pennsylvania "Supreme Court has long recognized a principle of general jurisprudence that a law can be repealed by the law giver; but the rights which have been acquired under it, while it was in force do not thereby cease [because] . . . [i]t would be an absolute injustice to abolish with the law all of the effects it had produced" (quotation marks and brackets omitted)); PNC Bank Corp. v. W.C.A.B. (Stamos), 831 A.2d 1269, 1279-1283 (Pa. Commw. Ct. 2003) (applying the abolition of common-law marriage prospectively); Tufts v. Tufts, 30 P. 309, 309-310 (Utah 1892) (amended statute providing for a lesser degree of cruelty as a cause for divorce should not be applied retroactively).

protections for the marriage relationship," found in the Fourteenth Amendment. Id. at 1207-1210.[4]

Legislative action also confirms the consensus against invalidating marriages that were valid prior to the adoption of statutory amendments that would have voided those marriages. This is evidenced by numerous statutes carving out exemptions for existing marriages. See, e.g., Alaska Stat. § 25.05.311 (1963); Fla. Stat. § 741.211 (1967); Ga. Code Ann. § 19-3-1.1 (1996); 750 Ill. Comp. Stat. 5/214 (1905); Ind. Code § 31-11-8-5 (1958); Mich. Comp. Laws § 551.2 (1957); Minn. Stat. § 517.01 (1941); Miss. Code Ann. § 93-1-15(2) (1956); 2 The Revised Codes of Montana of 1921 15 (1921) (citing Mont. Rev. Code 1935, §§ 5700-5703); Ohio Rev. Code Ann. § 3105.12(B)(2) (1991); 23 Pa. Cons. Stat. § 1103 (2004); S.D. Codified Laws § 25-1-29 (1959).

Like other states, Michigan also has a firm policy against the retroactive application of legislation generally. See Frank W. Lynch & Co. v. Flex Techs., Inc., 624 N.W.2d 180, 182 (Mich. 2001) (prospective application utilized "if retroactive application of a statute would impair vested rights, create a new obligation and impose a new duty, or attach a disability with respect to past transactions," unless legislative intent clearly indicates otherwise); Hughes v. Judges' Ret. Bd., 282 N.W.2d 160, 164 (Mich. 1979) ("A statute is construed to have prospective effect only unless the Legislature expressly, or impliedly, indicates its intention to give it

---

[4] Defendants attempt to distinguish Evans to no avail, by claiming that the decision turned on the "exercise [of] rights attendant to a marriage." Defs. Resp. to Inj. Mot. at 23. In fact, the Evans court made clear that the marriages in that case were valid at the moment of solemnization, and that "[n]o separate step can or must be taken after solemnization for the rights of a marriage to vest." Evans, 21 F. Supp. 3d at 1206. It was irrelevant in Evans, as it is in this case, whether the couples exercised any rights attendant to a marriage. Like Utah law discussed in Evans, Michigan law requires no act beyond obtaining a marriage license and solemnization to create a valid marriage. See discussion infra in connection with Defendants' "ab-initio" theory.

retrospective effect.").  This is in harmony with the federal rule against retroactive application of legislation:

> [T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic.  Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted.  For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal.  In a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions.

Landgraf v. USI Film Products, 511 U.S. 244, 265-266 (1994) (quotation marks, footnotes, and citations omitted).

These authorities — and the absence of any to the contrary — illustrate a consensus that the right to the continued validity of a marriage is "deeply rooted in this Nation's tradition," so long as, at the time it was solemnized, the marriage was authorized under the law of the state that seeks to defeat or diminish the marriage.  Whether prompted by the notions of vested rights or an aversion to retroactive application of the law, courts have been unwavering in their disapproval of any attempt to deprive people of their marital status when that state's law authorized the marriage when solemnized.  This uncontroverted history establishes that this right is fundamental and comprehended within the liberty protected by the Due Process Clause.

Viewed in this light, it is irrelevant whether Plaintiffs had a constitutional right to solemnize a same-sex marriage in the first instance — just as it would be irrelevant whether first cousins had a constitutional right to marry in the first instance, or whether an uncle had a constitutional right to marry his niece, or whether a couple had a constitutional right to engage in common-law marriage.  In all such instances, once a marriage has been solemnized pursuant to a

validly issued marriage license, the authorizing state cannot withdraw the status that it has awarded, even if the couples had no right to demand to be married in the first place.

To rule otherwise would be to create a pernicious precedent that could catastrophically undermine the stability that marriage seeks to create. If a state could withdraw the marital status it had granted, children would suddenly face the stigma that their family was no longer legally recognized. Estate plans would leave unaddressed taxable events or incidents with costly tax consequences. Carefully crafted pension arrangements would become inoperative, plunging survivors into potentially ruinous financial hardship. In terms of the personal ordering and orderliness of one's most fundamental affairs, nothing would be more destructive of "ordered liberty." And such disarray would come about not because of action voluntarily taken by the couple after they married, but rather due solely to a change in the solemnizing state's law.

In light of the fundamental nature of the right to maintain the marital status granted by the state seeking to defeat it, only a "narrowly tailored" and "compelling" state interest could defeat or diminish it. Glucksberg, 521 U.S. at 721; Jenkins v. Rock Hill Local Sch. Dist., 513 F.3d 580, 590 (6th Cir. 2008) (same). Defendants make no argument that any state interest served by the non-recognition policy is compelling. And in light of the discussion below, this Court sees no interest that meets this "usually unforgiving" standard. DeBoer, 772 F.3d at 410.

Defendants do, nonetheless, raise a number of arguments why Plaintiffs will not likely succeed on the merits — arguments that also form the basis of Defendants' motion to dismiss. As to each argument, Defendants are mistaken. Plaintiffs, therefore, have stated a plausible claim that the non-recognition policy violates the Due Process Clause, and they have shown a likelihood of succeeding on that claim.

**b.    Ab-Initio Theory**

Defendants' principal argument is that Plaintiffs' right to maintain their marriages can survive only so long as the initial decision that initially authorized their marriages is upheld. According to Defendants, if the district court's decision in <u>DeBoer</u> is not ultimately vindicated, Plaintiffs' marriages were void ab initio. For this same reason, Defendants suggest the Court refrain from deciding Plaintiffs' motion — and from hearing this case in its entirety — until after a final decision in the <u>DeBoer</u> case.

However, there is no authority supporting this "void ab initio" theory in the context of marriages. Defendants' notion that Plaintiffs' marriages were somehow "conditionally valid," Defs. Supp. Br. at 2 (Dkt. 43), is made out of whole cloth. There is nothing in the record to indicate that the marriage licenses that Michigan county clerks issued to Plaintiffs contained any language that was conditional. Nor does Michigan law recognize any concept of a conditional marriage. Indeed, Michigan law sets forth only two requirements for a lawful marriage: (i) a validly issued marriage license from a county clerk, and (ii) a solemn declaration, made before a person authorized to solemnize the union and before two witnesses, that the persons marrying take each other as spouses. <u>See</u> Mich. Comp. Laws §§ 551.2, 551.7, 551.9. Defendants concede these requirements were met. Thus, Michigan law was fully satisfied and imposed no conditionality on Plaintiffs' marriages.

Defendants seek support for their notion of conditionality based on the fact that the licenses were issued as a result of a decision by a single district judge. Defs. Supp. Br. at 2-3. But Michigan law contains no provision for conditional marriages based on what legal event may have prompted county clerks to issue marriage licenses. And certainly nothing in federal law makes conditional a marriage prompted by a district court ruling that was unquestionably in effect when the marriage licenses were issued. To be sure, it is not an everyday occurrence that a

18

state's law on marriage eligibility changes back and forth within a 24-hour period.  But that is simply a function of our legal system, which provides that an unstayed final judgment of a district court is effective immediately.  See, e.g., In re Copper Antitrust Litig., 436 F.3d 782, 793 (7th Cir. 2006) (stating that a "judgment of a district court becomes effective and enforceable as soon as it is entered; there is no suspended effect pending appeal unless a stay is entered"); Evans, 21 F. Supp. 3d at 1207 (same); see also Hovey v. McDonald, 109 U.S. 150, 161-162 (1883) (holding that, while granting a stay "would have been eminently proper[,] . . . where the power is not exercised by the court, nor by the judge who allows the appeal, the decree retains its intrinsic force and effect").

Defendants must, therefore, go beyond the marriage context and rely on their argument that, as a general matter, a judgment that is reversed on appeal has no effect.  Such a bald characterization of the law, however, is an oversimplified misstatement.

In fact, a reversed judgment may still have legal effects, many of which are extraordinarily consequential.  For example, the failure to obey an injunction that is later reversed may lead to criminal culpability for contempt.  United States v. United Mine Workers of Am., 330 U.S. 258, 294 (1947) ("Violations of an order are punishable as criminal contempt even though the order is set aside on appeal or though the basic action has become moot." (citation and footnote omitted)).  And while Defendants are correct that a reversal of a judgment will nullify the judgment as to the parties to the appeal in that litigation, "[a] reversal does not ordinarily control the interests of parties who did not join . . . the appeal," 36 C.J.S. Federal Courts § 739, much less non-parties, such as Plaintiffs.[5]

---

[5] Defendants cite numerous cases for the proposition that parties act at their peril if they act in accordance with a decree that is later reversed.  See Defs. Br. in Support of Mot. to Stay at 11; Defs. Reply in Support of Mot. to Stay at 4 (Dkt. 33).  But such cases address the consequences

In fact, there is a long-established principle that the reversal of a judgment on appeal will not affect the rights of non-parties who acted in good-faith reliance on the judgment.  See, e.g., Williams v. Vukovich, 720 F.2d 909, 927 (6th Cir. 1983) (reversing consent decree addressing racial discrimination in police hiring, but leaving undisturbed the rights of police officers already hired or promoted in reliance on the decree).  In the bankruptcy context, the Bankruptcy Code adopts this principle by mandating that a good-faith purchaser under an unstayed bankruptcy sale order may not have his or her rights affected by a reversal of the order on appeal.  See 11 U.S.C. § 363(m) ("The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.").

Moreover, the doctrine of mootness recognizes that third parties may have so significantly relied on a judgment that an appellate court has discretion to dismiss the appeal of that judgment, where relief could not properly be granted because of the inequitable impact on third parties — a doctrine that is inconsistent with Defendants' notion that an erroneous judgment is, in general, a legal nullity.  See, e.g., Curreys of Neb., Inc. v. United Producers, Inc. (In re United Producers), 526 F.3d 942, 952 (6th Cir. 2008) (dismissing creditors' appeal as moot, where reversal of reorganization plan would adversely impact third parties not before the court); Kessler v. Surface Transp. Bd., 637 F.3d 369, 372 (D.C. Cir. 2011) (dismissing appeal, where disputed property was sold to third party); Oakville Dev. Corp. v. F.D.I.C., 986 F.2d 611,

---

for parties in the litigation in which the judgment is reversed; they do not address the consequences to non-parties, such as Plaintiffs and those similarly situated.

615 (1st Cir. 1993) (dismissing appeal as moot, where property was sold to third party in a foreclosure sale).

These authorities confirm that Defendants' ab-initio argument is without foundation. Contrary to Defendants' assertion, a reversed judgment does not ordinarily nullify the rights that a third party may have acquired in reliance on the judgment when that judgment was still operative. The law provides far greater flexibility — and fairness — than Defendants concede. As shown above, that flexibility and fairness are illustrated by the protection the law accords to third-party rights in a variety of relatively mundane contexts, including routine matters of commerce. It would be a strange jurisprudence that would lend protection to such third parties, but not to those who entered into a highly personal — and for many, a sacred — contract for life. The law must, at a minimum, afford the same protection to married couples, by recognizing their fundamental liberty interest to maintain the validity of a lawful marital status acquired as a consequence of a non-stayed court order.

Defendants' efforts to breathe life into their ab-initio argument now that the Sixth Circuit has spoken in DeBoer also fails. Defendants argue that the Sixth Circuit's reversal of the district court has resurrected Michigan's ban on same-sex marriages, thereby invalidating Plaintiffs' marriages. Defs. Supp. Br. at 2-3. But nothing in the DeBoer opinion addresses the right to retain one's marital status in the face of the solemnizing state's effort to invalidate it. That question was never argued in DeBoer or decided.

Another argument premised on DeBoer also misses the mark. Defendants argue that the Sixth Circuit validated same-sex marriage bans in Ohio, Kentucky and Tennessee, which were challenged by out-of-state litigants whose same-sex marriages were lawful in the states from which they migrated. Defendants claim that the Sixth Circuit's holding in DeBoer that a state is

free to refuse recognition of out-of-state marriages that do not meet its own definition of marriage should be applicable to our case, as well.  However, that issue is not the issue in our case; we deal only with efforts by Michigan officials to abrogate a marital status that was lawfully acquired under Michigan law.  This issue does not implicate the Sixth Circuit's ruling that "a State does not behave irrationally by insisting upon its own definition of marriage rather than deferring to the definition adopted by another State."  DeBoer, 772 F.3d at 419.

This is so, because our case does not involve the potential erosion of the state's power to define marriage by forcing the state to accept the definition of marriage adopted in sister states. In our case, Plaintiffs acquired a marital status that Michigan bestowed upon them, and which Defendants — Michigan officials — themselves acknowledge was lawfully acquired at the time, pursuant to validly issued Michigan marriage licenses.  Nor does our case raise a potential conflict with the line of cases decided under the Full Faith and Credit Clause, under which states have long had the right to refuse recognition of out-of-state marriages that violate a state's public policy.  The Sixth Circuit in DeBoer saw this conflict as supportive of its holding that a state could legitimately refuse recognition of out-of-state marriages not encompassed under the refusing state's definition of marriage.  But no sister-state's definition of marriage is implicated here.  Thus, nothing in the DeBoer decision supports Defendants' position in our case.[6]

        **c.    Stay Order**

---

[6] Because none of the issues decided in DeBoer bear on our case, Defendants' argument as to whether DeBoer should be applied retroactively, see Defs. Reply in Support of Mot. to Stay at 3 (Dkt. 33), is irrelevant.

Defendants also purport to find refuge in the Sixth Circuit's full stay order.[7]  They read the order as reinstating the validity of Michigan's same-sex marriage ban for all marriages, whenever solemnized.  That reading is only partially correct.  While the stay order did resurrect the ban with respect to same-sex couples seeking to marry after entry of the stay order, the order says nothing about same-sex couples married before the stay came into effect.  Neither the language of the order, nor the parties' briefing in the Sixth Circuit on the stay motion, raised the issue of how same-sex couples married before the stay order was entered should be treated.  Had the panel majority meant the stay order to suspend or alter the marital status of those who had married on the strength of the district court order, the stay order would have so specified.  In the absence of any clear expression that the order was meant to be read in that fashion, this Court will not regard it as such.

### d.    Eleventh Amendment

Defendants also invoke the Eleventh Amendment, which bars "any suit in law or equity, commenced or prosecuted against one of the United States."  U.S. Const. amend. XI.  Defendants acknowledge that, under the doctrine of Ex parte Young, 209 U.S. 123 (1908), federal courts may, consistent with the Eleventh Amendment, entertain suits seeking prospective equitable or declaratory relief for violations of federal law against a state officer sued in his or her official capacity.  See Defs. Br. in Support of Mot. to Dismiss at 7 (Dkt. 21) (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 n.10 (1989)).  But Defendants argue that two impediments to Plaintiffs' case exist here: (i) the unavailability of prospective relief, and (ii)

---

[7] The operative language of the full stay order states that the Sixth Circuit "[grants] Michigan's motion to stay the district court's order pending final disposition of Michigan's appeal by this court."  DeBoer v. Snyder, No. 14-1341, 3/25/14 Order at 3.

Plaintiffs' alleged failure to plead a causal connection between the alleged deprivation of rights and Defendants' actions.  Both arguments are flawed.

The argument based on the unavailability of prospective relief is premised on the notion that the Sixth Circuit stay order mandates non-recognition of Plaintiffs' marriages.  In essence, the argument is that the Eleventh Amendment bars an action seeking prospective injunctive relief where the plaintiff has no right, on the merits, to such relief.  Defendants offer no case for this novel proposition, and the Court's own research reveals none.  This is not surprising, given that Defendants' theory would raise an Eleventh Amendment issue — and its attendant jurisdictional implications — every time a plaintiff lost on the merits in an action seeking prospective injunctive relief.  Conflating the Eleventh Amendment with the merits is simply not how the Ex parte Young doctrine operates.  See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 646 (2002) (holding that "the inquiry into whether suit lies under Ex parte Young does not include an analysis of the merits of the claim"); Dubuc v. Mich. Bd. of Law Exam'rs, 342 F.3d 610, 616 (6th Cir. 2003) ("Importantly, determining whether the Ex parte Young doctrine applies does not involve an analysis of the merits of a plaintiff's claims.").

Regarding causal connection, Defendants misstate the law.  The Ex parte Young doctrine does not require a causal connection between the deprivation and some specific action that a defendant took.  Rather, "[a] plaintiff must allege facts showing how a state official is connected to, or has responsibility for, the alleged constitutional violations."  Top Flight Entm't, Ltd. v. Schuette, 729 F.3d 623, 634 (6th Cir. 2013) (emphasis added).  In other words, this requirement is satisfied where a state official has "some connection" to the unconstitutional legislation or other challenged action.  Allied Artists Picture Corp. v. Rhodes, 679 F.2d 656, 665 n.5 (6th Cir. 1982) ("[Ex parte Young] requires that the state officer sued have 'some connection' with the

24

enforcement of the allegedly unconstitutional Act."); <u>Floyd v. Cnty. of Kent</u>, 454 F. App'x 493, 499 (6th Cir. 2012) ("The state official sued [] must have, <u>by</u> <u>virtue</u> <u>of</u> <u>the</u> <u>office</u>, <u>some</u> <u>connection</u> with the alleged unconstitutional act or conduct of which the plaintiff complains." (emphasis added)).

Here, the named Defendants are alleged to have more than mere "[g]eneral authority to enforce the laws of the state." <u>Children's Healthcare is a Legal Duty, Inc. v. Deters</u>, 92 F.3d 1412, 1416 (6th Cir. 1996) (quotation marks omitted). Each has had either some direct, personal involvement in the deprivation, or has responsibility to enforce the policy of not recognizing Plaintiffs' marriages — matters for which Plaintiffs have plausibly set forth facts.

Plaintiffs have alleged facts showing how Governor Snyder "is connected to, or has responsibility for," not recognizing Plaintiffs' marriages. <u>Top Flight Entm't, Ltd.</u>, 729 F.3d at 634. As Governor, he has broad supervisory responsibilities over the executive departments of the state. <u>See</u> Mich. Const. art. V, § 8 ("Each principal department shall be under the supervision of the governor unless otherwise provided by this constitution."). More specifically, however, Governor Snyder was the key decision-maker for adopting the policy of not recognizing Plaintiffs' marriages in light of the disagreement with the district court's decision.

Plaintiffs Clint McCormack and Bryan Reamer are suing Maura Corrigan in her official capacity as director of the Michigan Department of Human Services ("DHS"). Compl. ¶ 19. These Plaintiffs wish to jointly adopt each other's children, as well as three girls who have been removed from the custody of their biological parent, whose legal rights to the children are likely to be terminated. <u>Id.</u> ¶¶ 51, 52. Plaintiffs have alleged that, under state law, DHS must give final approval to adoptions that arise out of the foster care system. <u>Id.</u> ¶ 53. Plaintiffs contend that "DHS has indicated on its Michigan Adoption Resource Exchange" website that only married

couples may jointly adopt foster children.   Id.   Thus Director Corrigan, as the head of her department, is integrally connected to the policy of non-recognition.

Plaintiffs Frank Colasonti, Jr. and James Ryder are suing Phil Stoddard in his official capacity as director of the Michigan Office of Retirement Services ("ORS").   Id. ¶ 20. According to Plaintiffs, under the Michigan Public School Employees Retirement System ("MPSERS"), ORS "allows newly married retirees to adjust their pension disbursements to a lower monthly amount received in order to preserve future pension payments and health benefits for a surviving spouse."   Id. ¶ 58.   Plaintiffs contend that when Colasonti "contacted ORS regarding his March 22, 2014 marriage and his desire to provide pension benefits to [Ryder], he was told by ORS staff that, pursuant to an internal memo, the ORS can recognize only marriages between a man and a woman, and that the MPSERS pension option for surviving spouses would therefore not be available to him while the DeBoer stay remained in place or unless Governor Synder changed his position regarding the status of the March 22, 2014 marriages."   Id. ¶ 59. Director Stoddard, as the head of his department, has direct responsibility for carrying out the non-recognition policy.

Plaintiffs Samantha Wolf and Martha Rutledge are suing James Haveman in his official capacity as director of the Michigan Department of Community Health ("DCH").   Id. ¶ 21.   Wolf wants Rutledge "to be covered under the health insurance policy that [Wolf] receives through her employment at [DCH]."   Id. ¶ 64.   According to Plaintiffs, "[s]uch coverage is normally available to spouses of [DCH] employees[,] and is far more comprehensive than the benefits [Rutledge] currently receives under Medicare."   Id.   Plaintiffs contend that Wolf "requested health coverage for [Rutledge] as her legal spouse" the Monday following their marriage.   Id. ¶ 65.   However, Wolf claims that she was informed by DCH that it would not "recognize her legal

marriage or provide [Rutledge] with spousal health insurance benefits because of Governor Snyder's statement regarding the marriages of same-sex couples that took place on March 22, 2014."  Id.  Director Haveman, as the head of his department, has responsibilities directly connected to the non-recognition policy.

All Defendants have "some connection" to the unconstitutional policy sufficient to satisfy the requirements of the Eleventh Amendment.  Therefore, the Eleventh Amendment poses no bar to this action.

### e.    Standing and Ripeness

A plaintiff must satisfy three requirements for Article III standing.  First, the plaintiff must have suffered an "injury in fact," defined as "an invasion of a legally protected interest" that is "concrete and particularized," i.e., "actual or imminent," as opposed to "conjectural or hypothetical."   United States v. Windsor, 133 S. Ct. 2675, 2685 (2013) (quotation marks omitted).  Second, a causal connection must exist between the injury and the conduct of which a plaintiff complains.  Id.  That is to say, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."   Id. (quotation marks, brackets, and ellipsis omitted).  Third, it must be "likely," rather than "merely speculative, that the injury will be redressed by a favorable decision."  Id. (quotation marks omitted); accord Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992).

Ripeness is a related doctrine, requiring a court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  Nat'l Park Hospitality Ass'n v. Dep't of Interior, 538 U.S. 803, 814 (2003) (Stevens, J., concurring)

(quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148-149 (1967)).   The Sixth Circuit has delineated three factors for courts to evaluate:

> (1) the likelihood that the harm alleged by the plaintiffs will ever come to pass; (2) whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims; and (3) the hardship to the parties if judicial relief is denied at this stage in the proceedings.

Miller v. City of Cincinnati, 622 F.3d 524, 532 (6th Cir. 2010) (quotation marks omitted).

Defendants' standing argument — pertaining to only some of the Plaintiffs — is that these Plaintiffs' injuries are "conjectural or hypothetical."   Defs. Br. in Support of Mot. to Dismiss at 22.   Defendants point to the following allegations as insufficient: (i) Marsha Caspar wants to add Glenna DeJong to her insurance plan; (ii) Clint McCormack and Bryan Reamer want to adopt children, but have not begun the process; (iii) Bianca Racine and Carrie Miller allege potential financial difficulties in starting a family; and (iv) Martin Contreras and Keith Orr allege emotional concerns about the status of their marriage.   Id. at 22-23.

Regarding causation, Defendants reprise their argument that no specific conduct by Defendants Corrigan, Stoddard, or Haveman has resulted in any of the alleged injuries.   Regarding redressability, Defendants argue that some of the alleged tangible harms — for example, pertaining to adoption and financial aid — are dependent on issues beyond marital status, making it unlikely that a decision favorable to Plaintiffs will redress their injuries.   For their ripeness argument, Defendants reprise their arguments of non-particularized injuries and the absence of a record demonstrating that the lack of recognized marital status alone will result in harm.

Defendants' arguments all lack merit.   Their standing and ripeness arguments are myopic in that they fail to recognize the central harm that the non-recognition of Plaintiffs' marriages is

alleged to have produced: the severe emotional harm through the assault on Plaintiffs' dignity. That may fairly be described as "concrete and particularized," just as any emotional harm would be if it stemmed from a legally protected interest.  Baskin v. Bogan, 983 F. Supp. 2d 1021, 1025 (S.D. Ind. 2014) (standing satisfied based in part on intangible harm to "dignity" resulting from non-recognition of same-sex marriage); Stahlman v. United States, 995 F. Supp. 2d 446, 453 (D. Md. 2014) (emotional harm is sufficient to satisfy the injury-in-fact requirement if "the alleged harm stems from the infringement of a 'legally protected interest'").  Because Defendants have announced and maintained a policy of non-recognition that violates Plaintiffs' due-process rights, there can be no question that the claim of emotional harm is neither conjectural nor hypothetical; it is palpable, present, and persistent.

Defendants overlook, as well, certain tangible harms.  Caspar alleges that she asked her employer to add DeJong to her insurance plan but cannot receive a decision because of the uncertain legal status of their marriage.  Compl. ¶ 47.  Racine, a member of the National Guard for nine years, was told that financial-aid programs funded by the State of Michigan would not be available for her same-sex spouse.  Id. ¶ 83.  There is nothing "conjectural" or "hypothetical" about these harms.

And Defendants' actions in announcing, maintaining, and enforcing the non-recognition policy make the harm fairly traceable to their conduct.  Further, a decision of this Court favorable to Plaintiffs would unquestionably stop at least some of these harms, thereby satisfying the redressability factor.  For example, the denial of health insurance and pension benefits — as well as loss of dignity — would be reversed if the non-recognition policy were reversed. Because there is standing for at least some of the claimed harms, it is irrelevant whether other

harms, standing alone, would not support standing.  See Sch. Dist. of City of Pontiac v. Sec'y of the U.S. Dep't of Educ., 584 F.3d 253, 261 (6th Cir. 2009).

The ripeness factors are also satisfied.  The alleged harm of impaired human dignity and denial of at least some tangible benefits have already come about, thereby establishing that the factual record is sufficiently developed, such that there is no need to await future events for adjudication of the issues in this action.  And delaying judicial resolution of these issues would serve no useful purpose.  To the contrary, such delay would compound the harms these Plaintiffs suffer each day that their marital status remains unrecognized.

### f.   Declaratory Judgment

Defendants also claim that the Court should decline jurisdiction over this case under the Declaratory Judgment Act.  Defs. Br. in Support of Mot. to Dismiss at 14.  That act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201.  The exercise of jurisdiction in a declaratory judgment action is consigned to the court's discretion.  Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995).  In exercising that discretion, courts consider five factors:

> (1) Whether the declaratory action would settle the controversy;
>
> (2) Whether the declaratory action would serve a useful purpose in clarifying the legal relations at issue;
>
> (3) Whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for res judicata;"

(4) Whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and

(5) Whether there is an alternative remedy which is better or more effective.

Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 554 (6th Cir. 2008) (citing Grand Trunk W. R.R. Co. v. Consol. Rail Co., 746 F.2d 323, 326 (6th Cir. 1984)).

Defendants' arguments against the exercise of jurisdiction all lack merit. As to factors 1 and 2, Defendants argue that the ultimate appellate decision in DeBoer will control the outcome of this case, making this case irrelevant. As previously stated, this view is misguided. Even if the ultimate outcome of the DeBoer case is that same-sex couples have no constitutional right to marry, Plaintiffs in this action nonetheless have a fundamental right to maintain the validity of their marriages — which Michigan law authorized — against the refusal by Michigan officials to recognize them. This case will settle that issue.

Factor 3 is not pertinent, because courts have utilized it in a vastly different context — where there was a race to the courthouse by the declaratory-judgment plaintiff and its opponent, who may have sought or was about to seek an alternative judicial forum. See AmSouth Bank v. Dale, 386 F.3d 763, 788 (6th Cir. 2004) ("Courts take a dim view of declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum. Allowing declaratory actions in these situations can deter settlement negotiations and encourage races to the courthouse, as potential plaintiffs must file before approaching defendants for settlement negotiations, under pain of a declaratory suit."). Here, there was no race to the courthouse. In

fact, Plaintiffs are both the declaratory-judgment plaintiffs and the "natural" plaintiffs, as they are not conceivable defendants; Plaintiffs are the only parties seeking relief.[8]

Nor is there any possible friction between federal and state courts that this litigation might generate.  There is no related action pending in a state court — the circumstance that factor 4 was designed to address.  Scottsdale Ins. Co., 513 F.3d at 559-560.  And while Defendants argue that a decision here would "creat[e] friction between this Court and the State's broad authority and significant interests in regulating the subject matter of this action," Defs. Br. in Support of Mot. to Dismiss at 16, federal courts routinely review state enactments. Defendants present no case suggesting that this creates unacceptable friction between federal courts and states.  Further, this factor is concerned principally with friction arising from federal courts addressing issues of state law.  Scottsdale Ins. Co., 513 F.3d at 559 ("The Supreme Court has cautioned that where another suit involving the same parties and presenting opportunity for ventilation of the same state law issues is pending in state court, a district court might be indulging in gratuitous interference, if it permitted the federal declaratory action to proceed." (quotation marks and brackets omitted) (emphasis added)).   This case raises federal constitutional issues — not issues under state law.

Nor should a decision by this Court create any unacceptable friction with the Sixth Circuit, as Defendants argue.  Defs. Br. in Support of Mot. to Dismiss at 16.  If the Sixth Circuit disagrees with how this Court has interpreted its stay order, the DeBoer decision, or any other

---

[8] Defendants' "procedural fencing" arguments lack merit.  Defendants claim that Plaintiffs seek a declaration so as to secure benefits before the district court ruling in DeBoer is called into question by an appellate decision.  Defs. Br. in Support of Mot. to Dismiss at 15.  They also claim that the declaratory judgment action is a collateral attack on the Sixth Circuit stay order. Id.  Neither of these motives involves a race to the courthouse, the chief concern of this factor. Nor is this suit a collateral attack on the stay order, as that order does not address persons married before the stay order went into effect.

issue of law, it will take appropriate appellate action — hardly an eventuality that should deter a district court from entertaining a declaratory-judgment action.

As for a more effective remedy than declaratory relief, Defendants offer no candidates.

Not only do the five traditional factors counsel rejecting Defendants' argument; so does another factor, under which courts examine whether dismissal of the declaratory count would not lead to any efficiencies because counts seeking related relief, such as injunctive relief, are closely intertwined with the request for declaratory relief:

> When a plaintiff seeks relief in addition to a declaratory judgment, such as damages or injunctive relief, both of which a court must address, then the entire benefit derived from exercising discretion not to grant declaratory relief is frustrated, and a stay or dismissal would not save any judicial resources.  The claims in this case for which declaratory relief is requested and those for which injunctive relief is requested are so closely intertwined that judicial economy counsels against dismissing the claims for declaratory judgment relief while adjudicating the claims for injunctive relief.

Adrian Energy Assoc. v. Mich. Pub. Serv. Comm'n, 481 F.3d 414, 422 (6th Cir. 2007) (emphasis in original).  Here, injunctive relief and declaratory relief do appear to be intertwined, furnishing yet another reason for refusing dismissal of the request for declaratory relief.

For all of these reasons, Plaintiffs' claims seeking declaratory relief will not be dismissed.

### g.    Improper Injunction

Defendants also argue that the type of preliminary injunction sought by Plaintiffs is one that courts "particularly disfavor," and thus triggers greater judicial scrutiny, because it: (i) alters the status quo, (ii) requires Defendants to take affirmative action, rather than merely desist from certain conduct, and (iii) affords Plaintiffs all the relief they could recover after a trial.  Defs. Resp. to Inj. Mot. at 8 (Dkt. 22).

The premise that there are "disfavored" injunctions finds no support in Sixth Circuit law. Notably, the authorities cited by Defendants were district court cases that relied on Tenth Circuit authority for the proposition that certain types of injunctions are disfavored. See Cox v. Jackson, 579 F. Supp. 2d 831, 855 n.8 (E.D. Mich. 2008); MK Chambers Co. v. Dep't of Health & Human Servs., No. 13-11379, 2013 WL 5182435, at *4 (E.D. Mich. Sept. 13, 2013). The Sixth Circuit, however, has rejected Tenth Circuit authority requiring more exacting judicial scrutiny of injunctions that alter the status quo, are mandatory in nature, or grant substantially all of the relief to which a plaintiff may ultimately be entitled after trial:

> Recognizing that preservation of the court's ability to exercise meaningful review may require *affirmative* relief in order to prevent some future irreparable injury, several commentators have criticized judicial hesitancy to disturb the status quo where the conditions favoring injunctive relief are satisfied . . . . We therefore see little consequential importance to the concept of the status quo, and conclude that the distinction between mandatory and prohibitory injunctive relief is not meaningful. Accordingly, we reject the Tenth Circuit's "heavy and compelling" standard and hold that the traditional preliminary injunctive standard—the balancing of equities—applies to motions for mandatory preliminary injunctive relief as well as motions for prohibitory preliminary injunctive relief.

United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth., 163 F.3d 341, 348 (6th Cir. 1998) (citations omitted) (emphasis in original).

Nor is there anything to disfavor about an injunction that may grant an applicant full relief before a trial, in a case where a trial is not likely to resolve any significant factual issue. Indeed, no evidentiary hearing is required for a preliminary injunction when factual matters are not in material dispute. See Hunter v. Hamilton Cnty. Bd. of Elections, 635 F.3d 219, 246 (6th Cir. 2011) (a hearing is not required "when the issues are primarily questions of law" (quotation marks omitted)); Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp., 511 F.3d

535, 553 (6th Cir. 2007) (a district court is not required to hold an evidentiary hearing before granting a preliminary injunction "where material facts are not in dispute, or where facts in dispute are not material to the preliminary injunction" (quotation marks omitted)).   Here, Defendants did not request an evidentiary hearing in connection with the injunction motion; nor do they identify any factual issue that a trial would have to resolve.   As currently postured by the parties, this case involves pure questions of law without any disputed factual predicates.

Accordingly, Plaintiffs do not seek an "improper" injunction.[9]

In sum, Plaintiffs have demonstrated a likelihood of success on the merits on their due-process claim, and Defendants have failed to raise any viable basis for dismissing this action.[10]

---

[9] Defendants raise a number of other arguments that are, similarly, without merit.

- Defendants appear to suggest that Plaintiffs unnecessarily delayed the filing of their motion seeking preliminary injunctive relief.  Defs. Resp. to Inj. Mot. at 15, 19.  While laches is a potential equitable defense, Defendants have not expressly invoked it.  Nor have they alleged or substantiated any prejudice — a necessary element for laches.  Costello v. United States, 365 U.S. 265, 282 (1961) ("Laches requires proof of (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense.").

- Defendants contend that the Court lacks jurisdiction because of the one-sentence order in Baker stating that a same-sex-marriage challenge failed to raise a substantial federal question.  Defs. Reply in Support of Mot. to Dismiss at 4-6 (Dkt. 31).  As stated earlier, this case does not address the right of same-sex couples to marry.

- Defendants claim that any harm to Plaintiffs flows from the stay order, not their actions, Defs. Br. in Support of Mot. to Dismiss at 18 (Dkt. 21), and that the stay is some kind of "superseding" event, Defs. Reply in Support of Mot. to Dismiss at 3.  As earlier stated, the stay order, by its terms, did not purport to apply to those married before it came into effect.

[10] Courts generally avoid unnecessary adjudication of constitutional questions.  Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988) ("A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.").  Because the preliminary injunction may be granted on due-process grounds, there is no need to discuss Plaintiffs' equal-protection claim.  See Peters v. Kiff, 407 U.S. 493, 497 n. 5 (1972) (not addressing the equal-protection claim because the

### 3.   The Remaining Preliminary Injunction Factors

"When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'" Obama for Am. v. Husted, 697 F.3d 423, 436 (6th Cir. 2012) (quoting Jones v. Caruso, 569 F.3d 258, 265 (6th Cir. 2009)).  Nonetheless, consideration of the other preliminary injunction factors is appropriate.  Id.  All factors decisively counsel granting Plaintiffs' motion.

### a.      Irreparable Harm

Irreparable injury may be presumed when there is a constitutional violation.  Id. ("When constitutional rights are threatened or impaired, irreparable injury is presumed.").

Further, the hallmark of irreparable injury is the unavailability of money damages to redress the injury.  Tenke Corp., 511 F.3d at 550.  Where damages are difficult to calculate, the injury may also be deemed irreparable.  Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992) ("[A]n injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate."); E.E.O.C. v. Chrysler Corp., 546 F. Supp. 54, 70 (E.D. Mich. 1982) (in an age discrimination case, finding "that the psychological and physiological distress suffered by the claimants" constituted irreparable harm for purposes of a preliminary injunction), aff'd, 733 F.2d 1183 (6th Cir. 1984); see also Moore v. Consol. Edison Co. of New York, Inc., 409 F.3d 506, 511 (2d Cir. 2005) (recognizing that "claims of emotional and physical harm may in some circumstances justify preliminary injunctive relief"); United States v. Matusoff Rental Co., 494 F. Supp. 2d 740, 756 (S.D. Ohio 2007) (concluding that irreparable harm had been established where victims of discriminatory practices "suffered

---

case was resolved on due-process grounds).  That portion of Defendants' motion to dismiss is denied without prejudice.  Should future developments make clear that the Court should rule on the viability of the equal-protection claim, Defendants will be granted leave to renew their motion at that time.

emotional distress" and "the remedies available at law are inadequate to compensate for such injuries" because emotional distress is "difficult, if not impossible, to calculate with mathematical precision"); Pollis v. New Sch. for Soc. Research, 829 F. Supp 584, 598 (S.D.N.Y. 1993) (rejecting the contention "that non-economic claims such as emotional or psychological damage can never, as a matter of law, demonstrate irreparable harm sufficient to justify a preliminary injunction").

Here, the harms Plaintiffs allege include intangible matters, such as loss of dignity and other emotional injury, which are not susceptible to quantitative calculation.  In similar contexts, courts have found such harm to be irreparable.  For example, in Majors v. Jeanes, - F. Supp. 3d -, 2014 WL 4541173, at *6 (D. Ariz. Sept. 12, 2014), the court granted a preliminary injunction requiring a county clerk in Arizona to issue a death certificate showing the plaintiff's same-sex spouse, whom he had married lawfully out-of-state, as "married."  The court held that the "loss of dignity and status," as well as the "deprivation of a constitutional right," constituted irreparable injury.  Id. at *5.  To the same effect is Baskin v. Bogan, 983 F. Supp. 2d 1021, 1028 (S.D. Ind. 2014) (awarding preliminary injunction requiring same-sex spouse to be listed on death certificate, finding irreparable injury from deprivation of constitutional right and loss of "dignity that official marriage status confers").

Defendants offer no meaningful response.  They argue that the harm could not be "immediate," because Plaintiffs waited 23 days to file suit and another 45 days before filing their preliminary injunction motion.  Defs. Resp. to Inj. Mot. at 15.  Given both the significance and the complexity of the issues that needed to be briefed, as well as the number of parties who needed to be consulted, this hardly suggests a lack of diligence on Plaintiffs' part, or that the claimed harms were not imminent.  See, e.g., BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.,

229 F.3d 254, 264 (3d Cir. 2000) ("To the extent that delay can justify denial of a motion for a preliminary injunction, a delay caused by a plaintiff's good faith efforts to investigate an infringement or to determine how serious an infringement is does not preclude a finding of irreparable harm." (quotation marks and citations omitted)).

Defendants also argue that the injuries are "speculative, entirely unrelated to the conduct of Defendants, and/or dependent on factors beyond mere marital status." Defs. Resp. to Inj. Mot. at 15. The Court rejected this argument in its earlier discussion on standing and ripeness, which need not be repeated here.

Defendants also claim that the injuries are all compensable with money damages. Id. at 16. But Defendants offer no explanation as to who these Plaintiffs should sue for compensation for loss of human dignity by virtue of the non-recognition policy. If Defendants suggest that they themselves would be potential targets for suit, there are clear impediments, such as immunity, that would render uncertain any claim for monetary damages. Where the availability of a money damage remedy is significantly in doubt because of an immunity defense, money damages are not deemed an adequate remedy, rendering the harm irreparable. Feinerman v. Bernardi, 558 F. Supp. 2d 36, 51 (D.D.C. 2008) ("Where…the plaintiff in question cannot recover damages from the defendant due to the defendant's sovereign immunity[,]…any loss of income suffered by a plaintiff is irreparable per se." (citations omitted)); United States v. New York, 708 F.2d 92, 93-94 (2d Cir. 1983) (affirming that injury could be irreparable because defendant would be immune from money damage recovery under the Eleventh Amendment).

Because Plaintiffs allege that they have suffered both a constitutional violation and significant emotional injury and harm to their dignity from the denial of their marital status, irreparable injury is established.[11]

### b.    Public Interest

The public interest is served by an injunction here because it will protect Plaintiffs' due-process rights.  Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART), 698 F.3d 885, 896 (6th Cir. 2012) ("[T]he public interest is promoted by the robust enforcement of constitutional rights.").

### c.    Balance of Equities

Finally, the balance of the equities tips decidedly in favor of an injunction.  Plaintiffs present a compelling case of loss of dignity and devastating emotional trauma.  Same-sex couples, like their opposite-sex-couple counterparts, have the same innately human impulse to maintain bonds of committed intimacy in a socially and legally recognized marriage.  The non-recognition policy frustrates that impulse and triggers a deeply felt sense of degradation from the loss of marital status caused by the state that solemnized it in the first instance.

On the other side of the ledger, Defendants offer no convincing counter-argument.  They claim that Governor Snyder will have lost the benefit of the Sixth Circuit stay in DeBoer, and

---

[11] Two other points made by Defendants regarding irreparable harm are irrelevant, given that the Court's analysis of irreparable harm is limited to constitutional harm, emotional injury, and loss of dignity.  First, Defendants argue that the more-tangible harms of loss of benefits are not irreparable because other (though more costly) benefit arrangements can be made.  Defs. Resp. to Inj. Mot. at 17.  Second, Defendants submit that the harm of "uncertainty" regarding Plaintiffs' marriages is a product of Plaintiffs' own decision to marry in the face of a public announcement that the DeBoer defendants would appeal the decision.  Id. at 17-19.  As these identified harms are distinct from loss of human dignity, emotional injury, and constitutional harm, these arguments need not be addressed.  In any case, as to Defendants' self-inflicted-wound theory, there is no authority offered by Defendants that would fault an applicant for injunctive relief based on his or her decision to take advantage of legal rights that the law authorized.

that there will be a "conflict" between this Court and the Sixth Circuit. However, as previously stressed, the Sixth Circuit stay did not address the status of those who married while the district court's order was still in effect; thus the Governor has lost no benefit secured by the stay. And, because recognizing those marriages solemnized in accordance with Michigan law does not contradict the stay order, there is no foreseeable friction with the Sixth Circuit.

Defendants also claim that there will be "confusion" regarding the status of the other same-sex couples who married on March 22 in Michigan, but who did not join in this action, and that there would be "disparate treatment" in making only the named Plaintiffs the injunction's beneficiaries. Defs. Resp. to Inj. Mot. at 21-22. What the confusion might be is never explained. In any case, the injunction will draw no distinction between those who joined this lawsuit and those who did not. All are victims of the same constitutional violation and all have suffered the same types of harm. Making all couples beneficiaries of the injunction will prevent the disparate treatment feared by Defendants.

Defendants' disparate-treatment argument is further flawed, because it is premised on the notion that a court is powerless to order relief beyond named plaintiffs of an action in the absence of class allegations. Id. Defendants' argument misreads the law.

Courts have regularly held that a plaintiff may seek an injunction applicable to all similarly-situated individuals harmed by the same unconstitutional practice, without the necessity of seeking class-action treatment. See, e.g., Craft v. Memphis Light, Gas & Water Div., 534 F.2d 684, 686 (6th Cir. 1976) ("[T]he district court properly recognized that such [injunctive] relief to the extent granted [would] . . . accrue to the benefit of others similarly situated and, consequently, as the Eighth Circuit has recognized, [n]o useful purpose would be served by permitting this case to proceed as a class action because [t]he determination of the

constitutional question can be made by the Court and the rules and regulations determined to be constitutional or unconstitutional regardless of whether this action is treated as an individual action or as a class action." (alterations in original) (quotation marks omitted)), aff'd, 436 U.S. 1 (1978); Drumright v. Padzieski, 436 F. Supp. 310, 325 (E.D. Mich. 1977) ("[A]bsent some unusual factors[,] suits for determination of the constitutionality of a federal statute or regulation should not be treated as a class action.  Therefore, the Court concludes that this action should not proceed as a class action.  No significant interest will be advanced by allowing the action to be maintained on behalf of a class.  Any relief that plaintiff may be able to prove himself entitled to will inure to the benefit of all those on whose behalf plaintiff asserts an interest." (quotation marks and internal citation omitted)); Curry v. Dempsey, 520 F. Supp. 70, 75 (W.D. Mich. 1981) ("[T]here is at any rate no useful purpose to be served by class certification in this case.  The parties are seeking a declaration of their legal rights and duties.  Any declaratory or injunctive relief will accrue to the benefit of others similarly situated whether there is a class or not, so a class action is unnecessary."), rev'd on other grounds, 701 F.2d 580 (6th Cir. 1983).

These authorities within the Sixth Circuit are in harmony with the prevalent rule outside the Sixth Circuit.  See 7A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Fed. Practice & Procedure § 1771 at 490-491 (3d 2005) ("In most civil-rights cases plaintiff seeks injunctive or declaratory relief that will halt a discriminatory employment practice or that will strike down a statute, rule, or ordinance on the ground that it is constitutionally offensive. Whether plaintiff proceeds as an individual or on a class-suit basis, the requested relief generally will benefit not only the claimant but all other persons subject to the practice or the rule under attack."); Sandford v. R L Coleman Realty Co., 573 F.2d 173, 178 (4th Cir. 1978) (recognizing "the settled rule [] that whether plaintiff proceeds as an individual or on a class suit basis, the

requested injunctive relief generally will benefit not only the claimant but all other persons subject to the practice or the rule under attack" (quotation marks and brackets omitted)); United Farmworkers of Fla. Hous. Project, Inc. v. City of Delray Beach, 493 F.2d 799, 812 (5th Cir. 1974) ("[W]hether or not appellants are entitled to class action treatment, the decree to which they are entitled is the same . . . . [T]he very nature of the rights appellants seek to vindicate requires that the decree run to the benefit not only of the named plaintiffs but also for all persons similarly situated"); Ihrke v. N. States Power Co., 459 F.2d 566, 572 (8th Cir. 1972) (same as Craft, 534 F.2d at 686), vacated on other grounds, 409 U.S. 815 (1972).

Defendants' citation to Tesmer v. Granholm, 333 F.3d 683 (6th Cir. 2003), rev'd sub nom. Kowalski v. Tesmer, 543 U.S. 125 (2004) is not persuasive.  In that action, the Sixth Circuit addressed a preliminary injunction declaring unconstitutional a Michigan statute forbidding judges to appoint appellate counsel for indigent criminal defendants who had pled guilty.  Id. at 686.  In reversing the district court, the Sixth Circuit held that the injunction improperly enjoined all of Michigan's circuit judges, who were not parties to the action.  Id. at 702 ("Our deepest concern with the equitable relief fashioned by the district court is that it enjoins non-party judicial officers.").  In our case, there is no such concern.  The injunction would not operate against non-parties (except those who act in concert with Defendants, pursuant to Federal Rule of Civil Procedure 65(d)(2)).[12]

---

[12] Neither party cited Sharpe v. Cureton, 319 F.3d 259, 273 (6th Cir. 2003), which held that "[w]hile district courts are not categorically prohibited from granting injunctive relief benefitting an entire class in an individual suit, such broad relief is rarely justified because injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." (emphasis in original).  In Sharpe, the Sixth Circuit reversed the district court for, among other reasons, extending the injunction's prohibition against political retaliation or favoritism to firefighters who had not joined in the lawsuit as plaintiffs.  Id. at 274. Nevertheless, Sharpe does not counsel restricting the injunction here only to the named Plaintiffs for three reasons: First, the Sixth Circuit made clear that there is no categorical requirement for

Accordingly, all same-sex couples who married in Michigan on March 22, 2014, pursuant to Michigan marriage licenses issued prior to the issuance of the Sixth Circuit stay, will be the beneficiaries of the preliminary injunction. Thus, there will be no disparate treatment, as feared by Defendants.

In sum, all relevant factors counsel granting Plaintiffs' motion for a preliminary injunction.

### B.  Motion for a Stay

Defendants' motion for a stay asks this Court to stay all proceedings in this case pending resolution of the appeal in DeBoer, "including a decision by the United States Supreme Court, if applicable." Defs. Mot. to Stay at 7 (Dkt. 20). It appears that Defendants' motion is still viable, notwithstanding the Sixth Circuit's decision reversing the district court in DeBoer, because Plaintiffs have filed a petition for a writ of certiorari with the Supreme Court.

The decision to stay is consigned to a court's discretion. Ohio Envtl. Council v. United States Dist. Court, S. Dist. of Ohio, E. Div., 565 F.2d 393, 396 (6th Cir. 1977). The appropriate analysis "calls for the exercise of judgment, which must weigh competing interests." Landis v. N. Am. Co., 299 U.S. 248, 254-255 (1936). Where the stay motion is premised on the alleged significance of another case's imminent disposition, courts have considered the potential dispositive effect of the other case, judicial economy achieved by awaiting adjudication of the other case, the public welfare, and the relative hardships to the parties created by withholding judgment. See, e.g., Monaghan v. Sebelius, No. 12-15488, 2013 WL 3212597, at *1 (E.D. Mich. June 26, 2013); Iljin USA v. NTN Corp., No. 06-10145, 2006 WL 568351, at *2 (E.D. Mich.

---

such a restriction. Id. at 273. Second, the non-party beneficiaries in Sharpe were subject to an administrative grievance process, which provided a remedy without the necessity of an injunction. Id. The same cannot be said of the same-sex couples here. Third, Defendants make no argument that extending the injunction to non-parties would appreciably add to any burden.

Mar. 7, 2006) (holding that, when considering a motion to stay, "it is unassailable that issues of judicial economy and balancing the interests of the parties and the Court are to be taken into account").

Defendants premise their motion on the theory that the ultimate resolution of the <u>DeBoer</u> litigation will be dispositive of Plaintiffs' claims in this case. Earlier in this opinion, the Court rejected the view that an affirmance of the Sixth Circuit's decision would affect the outcome of this case. On the other hand, a Supreme Court reversal of the Sixth Circuit would likely lead to vindication of Plaintiffs' claim. That possibility, however, is not sufficient to justify placing this litigation on hold. It does not appear — and no argument has been made — that extensive discovery will be required in this case, or that any factual issues need to be tried. Under these circumstances, there do not appear to be any significant judicial economies to be reaped by staying this action.

Consideration of the public interest also counsels against a stay. As discussed earlier, the public interest is always served by robust protection of constitutional guarantees. <u>See</u> <u>SMART</u>, 698 F.3d at 896. That is particularly so in this case, where the denial of a fundamental right so frontally assaults the human dignity of Plaintiffs and those similarly situated. Michigan's non-recognition policy divests Plaintiffs of an essential human dimension in their lives — the legally recognized bond of committed intimacy in a marriage that was solemnized and recognized as valid by the challenging state — the loss of which unquestionably wounds them deeply.

Defendants' hardships, on the other hand, are insubstantial when carefully considered. They claim that the democratic process must be protected. Defs. Reply in Support of Mot. to Stay at 6 (Dkt. 33). Of course, it must — so long as that process does not offend the

Constitution.  As Justice Frankfurter explained in <u>Gomillion v. Lightfoot</u>, 364 U.S. 339, 347 (1960):

> When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review.  But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.

The clash here between the non-recognition policy and the Due Process Clause is no different than the myriad cases in which state and federal governmental actions have been rebuffed because they contradict constitutional guarantees — judicial rebukes that go all the way back to <u>Marbury v. Madison</u>, 5 U.S. (1 Cranch) 137 (1803).

Defendants also claim that mandating recognition will continue to create "confusion, costs, and potential inequity."  Defs. Br. in Support of Mot. to Stay at 13-14.  However, Defendants do not fully spell out what specific harm may result.  They do claim that Michigan might seek to recover benefits paid out to Plaintiffs, if this decision is ultimately and finally reversed, and that such calculations may be complicated.  <u>Id.</u> at 14-15.  But Defendants offer no authority that would allow Michigan to recover such benefits, and the Court is aware of none.  Nor do Defendants sufficiently explain why such an unwinding would be impracticable, if permitted.  Defendants' concerns are essentially ephemeral.

Weighing all the considerations, the motion is denied to the extent it seeks a stay pending resolution of the Supreme Court's review in <u>DeBoer</u>.

However, the Court is cognizant that an appeal may be taken in this case.  Given the importance of the issues to all parties and the significant public dimensions of this decision, the prudent course is entry of a short-term stay of 21 days, to give the parties and the Sixth Circuit sufficient time to pursue an orderly appellate process in this action.  <u>See</u> <u>Evans v. Utah</u>, 21 F. Supp. 3d 1192, 1212 (D. Utah 2014) (denying the state's motion for a stay of the injunction

pending appeal, but granting a 21-day stay for the state to pursue an emergency stay with the Tenth Circuit, because "the court finds some benefit in allowing the Tenth Circuit's [sic] to review whether to stay the injunction prior to implementation").

Accordingly, the Court will stay the effectiveness of its order for 21 days.

### C. Motion to Consolidate

Defendants filed a motion to consolidate (Dkt. 27), seeking to consolidate this case with Blankenship v. Snyder, No. 14-12221 (E.D. Mich.) (Tarnow, J.). Consolidation is appropriate under Federal Rule of Civil Procedure 42 where there are common questions of law or fact. Fed. R. Civ. P. 42(a)(2) ("If actions before the court involve a common question of law or fact, the court may . . . consolidate the actions."). "Whether cases involving the same factual and legal questions should be consolidated for trial is a matter within the discretion of the trial court." Cantrell v. GAF Corp., 999 F.2d 1007, 1011 (6th Cir. 1993).

The central question in our case is whether a same-sex marriage solemnized pursuant to Michigan marriage licenses issued under Michigan law, as it stood at the time of solemnization, must be recognized in Michigan. The central question in Blankenship is markedly different: whether Michigan must recognize a same-sex marriage that was lawfully performed under the laws of another state — an issue similar, if not identical, to one of the issues decided by the Sixth Circuit in DeBoer. Because Blankenship raises a conceptually different question, the motion to consolidate is denied.

## IV. CONCLUSION

For the above reasons, Plaintiffs' motion for a preliminary injunction (Dkt. 17) is granted. Defendants are preliminarily enjoined from refusing to recognize the marital status of Plaintiffs and all other same-sex couples who were lawfully married in Michigan after the district court's

ruling authorizing such marriages in <u>DeBoer</u> and before the issuance of the stay by the Sixth Circuit on March 22, 2014 in that case. Defendants shall afford all such couples all the protections and benefits as are mandated or authorized by Michigan law for all couples whose marriages are validly solemnized under Michigan law. This injunctive order shall bind Defendants, their agents, servants, employees, and attorneys, and all other persons in active concert or participation with any such persons. <u>See</u> Fed. R. Civ. P. 65(d)(2). The effectiveness of this preliminary injunction is stayed for 21 days. The Court also denies Defendants' motions for a stay (Dkt. 20), to dismiss (Dkt. 21), and to consolidate cases (Dkt. 27).

      SO ORDERED.

Dated: January 15, 2015          s/Mark A. Goldsmith
       Detroit, Michigan          MARK A. GOLDSMITH
                           United States District Judge

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 15, 2015.

         s/Johnetta M. Curry-Williams
         Case Manager